EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>    Peticionario<br><br>           v.<br><br>Edward Rosario Orangel<br><br>    Acusado-recurrido | Certiorari<br><br>2003 TSPR 158<br><br>160 DPR \_\_\_\_ |

Número del Caso: CC-2001-1025


Fecha: 5 de noviembre de 2003


Tribunal de Circuito de Apelaciones:
                    Circuito Regional I


Juez Ponente:
                    Hon. Rafael Ortiz Carrión

Oficina del Procurador General:
                    Lcda. Rose Mary Corchado Lorent
                    Procuradora General Auxiliar

Abogada de la Parte Recurrida:
                    Lcda. Rosa I. Ward Cid



Materia: Asesinato en Segundo Grado y Otros



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

       vs.                  CC-2001-1025     CERTIORARI

Edward Rosario Orangel

    Acusado-recurrido

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ PRESIDENTE INTERINO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico 5 de noviembre de 2003

El 29 de enero de 1999 el recurrido Edward Rosario Orangel fue acusado del delito de Asesinato en Primer Grado, en violación al Artículo 83 del Código Penal de Puerto Rico,[1] y por infracciones a los Artículos 5 y 8A de la Ley de Armas de Puerto Rico;[2] ello en relación con hechos acaecidos el 7 de diciembre de 1998, donde fallecieron dos personas.

El juicio se celebró ante jurado en el Tribunal de Primera Instancia, Sala Superior de San Juan. Luego de desfilada la prueba de cargo, la defensa de Rosario Orangel solicitó del Juez

---

[1] 33 L.P.R.A. sec. 4002.

[2] 25 L.P.R.A. secs. 415 y 418a.

que presidió los procedimientos que impartiera instrucciones sobre el delito de Homicidio Voluntario, por entender que ello se justificaba a la luz de la prueba presentada por el ministerio público y admitida por el tribunal. El tribunal de instancia se negó a impartir las referidas instrucciones.

Sometido el caso por las partes[3], el jurado rindió veredictos de culpabilidad contra el recurrido por el delito de Asesinato en Segundo Grado y por las dos infracciones a la Ley de Armas que le fueron imputadas. Mediante sentencias dictadas el 28 de septiembre de 1999 el tribunal de instancia condenó al recurrido a pena de reclusión de 22 años por el delito de Asesinato en Segundo Grado, 15 años por la infracción al Artículo 5 de la Ley de Armas y 32 años por la infracción al Artículo 8A de la referida Ley.[4]

Inconforme con dicha determinación, Rosario Orangel acudió mediante recurso de apelación ante el Tribunal de Circuito de Apelaciones señalando varios errores, entre ellos, la actuación del foro primario "al negarse a

---

[3] La defensa presentó un solo testigo.

[4] Las penas impuestas, conforme determinó el tribunal de instancia al amparo de la Ley de Armas, serían cumplidas concurrentemente entre sí, pero de manera consecutiva con la pena impuesta por Asesinato en Segundo Grado. Asimismo, las cumpliría consecutivamente con relación a una sentencia dictada por el Estado de Texas el 17 de diciembre de 1997 en la que se condenó al recurrido a cumplir diez años de probatoria por la comisión del delito grave de posesión de marihuana.

impartir al jurado instrucciones sobre el delito de homicidio". Mediante sentencia de 26 de octubre de 2001, archivada en autos el 31 de octubre del mismo año, el Tribunal de Circuito de Apelaciones confirmó la sentencia impuesta por la violación del Artículo 5 de la Ley de Armas; modificó la pena de 32 años impuesta por la infracción al Artículo 8A de dicha Ley, reduciéndola a 25 años; y revocó la sentencia de convicción por el delito de Asesinato en Segundo Grado, devolviendo el caso para la celebración de un nuevo juicio en cuanto a ese delito.

Al así resolver el tribunal apelativo intermedio concluyó que el foro primario había errado al negarse a impartir al jurado las instrucciones sobre el delito de Homicidio Voluntario, toda vez que la prueba presentada, y admitida durante el juicio, permitía al jurado inferir los elementos de la súbita pendencia o arrebato de cólera. El foro apelativo intermedio entendió que, ante los ojos del jurado, el conocimiento de la muerte de un familiar cercano, podía constituir provocación suficiente capaz de llevarlo a concluir que lo ocurrido fue un homicidio en vez de un asesinato.

Inconforme con la actuación del tribunal apelativo intermedio, el Procurador General acudió  –vía *certiorari*– ante este Tribunal. Alega que procede revocar la sentencia emitida por el tribunal apelativo debido a que dicho foro incidió:

... al revocar la sentencia y convicción por el delito de asesinato en segundo grado cuando el foro de instancia actuó correctamente al no impartir instrucción de homicidio porque la prueba de ninguna manera lo justificaba al no haber evidencia alguna de que el acusado fue objeto de provocación alguna ni de que, objetivamente, existía razón alguna para que el acusado se sintiera provocado.

El 8 de febrero de 2002 expedimos el recurso. Contando con la comparecencia de ambas partes, y estando en posición de resolver el recurso radicado, procedemos a así hacerlo. Revocamos en parte y confirmamos en parte.

I

A la luz de los hechos particulares del presente caso, ¿procedía impartirle al jurado instrucciones sobre el delito de homicidio? Para contestar esta interrogante es menester examinar los hechos acontecidos según surgen de la "Exposición Narrativa de la Prueba Oral" estipulada por las partes y aprobada por el Tribunal de Instancia.[5] Veamos.

El 7 de diciembre de 1998 a eso de las 3:30 de la tarde la agente de la policía Milagros Agosto Pérez visitó

---

[5] Según se desprende de la "Exposición Narrativa de la Prueba Oral" sometida por la parte peticionaria en su escrito ante nos, la prueba presentada por el Ministerio Público consistió en el testimonio de Myrna López Cruz, Luis Dávila Rivera, Marielinda Ortiz Martínez, Yaritza Pérez Otero, María Cedeño Pérez, Samuel Morales, Robert Figueroa, Dr. Francisco Cortés Rodríguez y Juan Ortiz Brioni; mientras que la prueba de defensa sólo consistió en el testimonio de Manuel Hiram Camareno Colón.

--vistiendo de civil[6]-- la casa de una amiga que residía en la calle Francia de la Barriada Israel en Hato Rey, para que ésta le entallara unos pantalones de su uniforme de policía.[7] Cerca de las 4:00 de la tarde, mientras se saludaban y charlaban, oyeron unas detonaciones provenientes de la calle. Inmediatamente, Milagros Agosto Pérez salió de la casa y, en cumplimiento con su deber como oficial de la policía, corrió hacia la calle Texidor con el arma de reglamento en su mano derecha. Una vez llegó a dicha calle se encontró con el cadáver del joven José Peña tendido en el pavimento frente a la casa del recurrido, Rosario Orangel. El occiso era, alegadamente, un pariente del recurrido.[8] Luego de transcurridos alrededor de diez minutos desde la primera ráfaga de tiros

---

[6] *Ibid.* a la pág. 2. Resulta importante recalcar que al momento en que la agente acude al lugar de los hechos no llevaba puesto su uniforme de policía ni distintivo alguno que la identificara como tal. De la evidencia fotográfica, así como del Informe Médico-Forense que hemos tenido la oportunidad de examinar, surge que la occisa vestía una camiseta sin mangas color marrón con diseños blancos, un mahón azul y unas chancletas negras. Informe Médico-Forense, Instituto de Ciencias Forenses de Puerto Rico, preparado el 19 de enero de 1999, pág. 1.

[7] Testimonio de la testigo Myrna López Cruz, vecina de la calle Francia en la Barriada Israel, Exposición Narrativa de la Prueba, *E.N.P.*, pág. 2.

[8] Sin embargo, de la "Exposición Narrativa de la Prueba" surgen serias dudas e inconsistencias en cuanto al verdadero parentesco, si alguno, entre ambos ya que se hace referencia a Peña como hermano (*E.N.P.*, pág. 20); sobrino (*E.N.P.*, págs. 10, 13); y primo (*E.N.P.*, pág. 17) del recurrido. Asimismo, el alegato presentado por la defensa no nos permite afirmar con certeza si realmente existía entre ellos una verdadera relación familiar.

se escucharon otras detonaciones provenientes del frente de la casa de Rosario Orangel.[9]

Por su parte, Yaritza Pérez Otero, declaró que se encontraba ese día caminando por la calle Texidor a eso de las 4:00 de la tarde cuando vio a José Peña en la acera de la esquina de la calle Francia contigua a la calle Texidor. Según expuso, tan pronto como él la miró ella volteó su cara y miró hacia la acera contraria donde observó que una guagua se había detenido. Detrás de la guagua salió un muchacho que le apuntó a Peña con un rifle. Al ver esto la testigo corrió hacia su casa y, al no poder abrir la puerta, decidió ir a la casa de un vecino en la calle Francia. Durante este trayecto oyó las detonaciones que causaron la muerte de José Peña.[10]

Pérez Otero, luego, salió al balcón y vio a José Peña tirado en el pavimento en la calle Francia. A los cinco o diez minutos después de las primeras detonaciones, vio al recurrido Rosario Orangel salir de su casa con un rifle en la mano gritando *"mi hermano, mi hermano"* y caminando en dirección hacia donde yacía el cadáver de José Peña.[11] Declaró, que escuchó otras detonaciones de arma de fuego, por lo que entró a la casa y se agachó. Cuando culminaron

---

[9] Véase, *E.N.P.*, pág. 3.

[10] Testimonio de la testigo Yaritza Pérez Otero, vecina de la calle Texidor en la Barriada Israel, *E.N.P.*, pág. 19.

[11] *Ibid*. a las págs. 19-20.

los tiros oyó un chillido de gomas de carro proveniente de la casa del recurrido. Una vez se levantó, salió de nuevo al balcón y observó que al lado de donde se encontraba el cuerpo del joven José Peña estaba tirado el cuerpo de una mujer que resultó ser el cadáver de la agente Milagros Agosto Pérez.[12]

De otra parte, Marielinda Ortiz Martínez declaró que conocía al recurrido Rosario Orangel porque era tío de su novio Rubén Torres Rondón. Atestiguó que a eso de las 6:00 a 6:30 de la tarde del 9 de diciembre de 1998 --esto es, dos días luego de la ocurrencia de los hechos-- llegaron a su casa su novio Rubén y el recurrido Rosario Orangel. Declaró que Rosario Orangel le dijo *"dame cloro pa' lavarme las manos"* y que ella se lo dio. Luego de lavarse las manos Rosario Orangel se marchó.[13]

Declaró Ortiz Martínez, además, que el recurrido visitó nuevamente su casa el 11 de diciembre de 1998. En esa ocasión ella le preguntó a Rosario Orangel por qué se había lavado las manos con cloro días antes, a lo que éste respondió que era para borrar la evidencia de la pólvora del arma que utilizó para matar a la mujer. Continuó declarando que Rosario Orangel le dijo que *"había matado a la mujer policía, porque él creía que ella había matado a*

---

[12] *Ibid.*

[13] Testimonio de la testigo Marielinda Ortiz Martínez, *E.N.P.*, pág. 10.

*su sobrino Peña. Que cuando llegó al sitio que encontró a la muchacha con el arma de reglamento en la mano y ahí él actuó porque él creía que había matado a su sobrino."*[14] Testificó, además, que el recurrido regresó el sábado <u>12 de diciembre de 1998</u> a su casa y se quedó hasta el domingo. Manifestó que alrededor de la 1:00 a 1:30 de la tarde el recurrido se levantó, se vistió y se fue y que a los veinte minutos regresó detenido por la policía. La testigo declaró que a solicitud de la policía ésta los acompañó voluntariamente.[15]

Por otra parte, del Informe Médico-Forense estipulado por las partes, así como del testimonio del médico que

---

[14] *Ibid.* a la pág. 10.

[15] *Ibid.* a las págs. 10-11. A preguntas de la defensa, la testigo admitió que había prestado una declaración jurada el 13 de diciembre de 1998 ante el fiscal. A solicitud de éste la testigo leyó en voz alta la declaración jurada que, en lo pertinente, decía:

> El viernes 11 de diciembre regresa Edward a mi casa, ahí yo le pregunto a Edward que porque [sic] se lavó las manos con cloro, refiriéndose al miércoles 9 de diciembre, Edward me dijo que para que no hubiera evidencia de la pólvora. Como yo no sé que [sic] era la pólvora le pregunté que [sic] era eso y él me dijo que era de la misma arma. <u>Me dijo, además, *"chacho estoy encojonao porque mataron a mi primo inocentemente"*</u>. Edward me dijo que ese día habían dejado al sobrino en la barriada porque se iba a recortar. Que cuando ellos regresan a recoger el sobrino, se encuentran con una mujer policía con el arma de reglamento en su mano y el sobrino estaba tirado en el piso. Edward me dice *"<u>yo bregué con la mujer policía porque yo pensé que había matado a Peña</u>"*, y me dijo que usó algo de 47. *Ibid.* a la pág. 17 (énfasis nuestro).

realizó la autopsia de la occisa, Dr. Francisco Cortés Rodríguez, surge que ésta recibió seis heridas de bala en diferentes partes del cuerpo y tenía un "área de quemazón" en la parte posterior del brazo derecho.[16]

En cuanto a lo que se describe en el protocolo de autopsia como la herida de bala "A" se explica que la misma tuvo su orificio de entrada en el lado derecho frontal de la cabeza con trayectoria de abajo hacia arriba y de derecha a izquierda. La misma le ocasionó a la joven fractura en el cráneo causando contusiones cerebrales y hemorragia cerebral.[17] Se explica que la herida de bala "B" entró por la región toráxica izquierda a 50 pulgadas por encima del talón con trayectoria de arriba hacia abajo, de delante hacia atrás y de izquierda a derecha. La misma contusionó el pulmón izquierdo, perforó el corazón, lacerando la aorta y el pulmón derecho.[18]

Por su parte, la herida de bala "C" estaba localizada en la región supra inguinal derecha a 32 pulgadas por encima del talón con trayectoria de abajo hacia arriba, de adelante hacia atrás y de derecha a izquierda. Ésta penetró la cavidad pélvica y la abdominal, impactó el

---

[16] Testimonio del testigo Francisco Cortés Rodríguez, *E.N.P.*, págs. 41-42.

[17] *Ibid*. a la pág. 42; Informe Médico-Forense, Instituto de Ciencias Forenses de Puerto Rico, preparado el 19 de enero de 1999, pág. 1.

[18] *Ibid.*

intestino, el mesenterio, el hígado y penetró la columna vertebral.[19] En cuanto a la herida de bala "D", la misma impactó el cuarto dígito de la palma de la mano izquierda. La herida de bala "E" fue un surco que sólo hizo contacto con la piel y la herida de bala "F" entró por la parte posterior del hombro derecho; esto es, por la espalda.[20]

Por último, el patólogo forense manifestó que pudo observar partículas de pólvora en la piel del antebrazo izquierdo y en la cara; éstas relacionadas con, al menos, dos de la heridas sufridas, en particular, la que produjo la bala "B".[21] Concluyó, que ello evidencia que la víctima recibió esas dos heridas a sólo dos pies de distancia de la boca del cañón del arma de fuego utilizada.[22]

## II

La Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho a juicio por jurado que tiene toda persona que sea acusada por la comisión de delito grave. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1; véase,

---

[19] Informe Médico-Forense, ante, a la pág. 2. De acuerdo con el testimonio del Dr. Cortés Rodríguez las heridas de bala "A", "B" y "C" fueron las más graves, en particular, la ocasionada por la "B", y que la combinación de éstas fue la causante de la muerte de la joven. Véase, *E.N.P.*, págs. 43-44.

[20] Véase, Testimonio del Dr. Cortés Rodríguez, *E.N.P.*, págs. 42-43; Informe Médico Forense, ante, a la pág. 2.

[21] Véase, Testimonio del Dr. Cortés Rodríguez, *E.N.P.*, págs. 43-45.

[22] *Ibid.* a la pág. 45.

además: <u>Pueblo</u> v. <u>Bonilla Ortiz</u>, 123 D.P.R. 434, 438-39 (1989); <u>Pueblo</u> v. <u>Cruz Correa</u>, 121 D.P.R. 270, 276 (1988). Igualmente, la Regla 111, de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 111 reconoce el derecho a ser juzgado por sus pares a todo acusado de delito grave e inclusive, en ciertas circunstancias, al acusado de delito menos grave. Véase, <u>Pueblo</u> v. <u>Lorio Ormsby</u>, 137 D.P.R. 722, 727 (1994); <u>Pueblo</u> v. <u>Cruz Correa</u>, ante; E.L. Chiesa Aponte, <u>Derecho Procesal Penal de Puerto Rico y Estados Unidos</u>, Colombia, Ed. Forum, 1992, Vol. II, pág. 273.

Dentro de este esquema le corresponde al jurado, como encomienda principal, <u>ser el juzgador de los hechos</u>. Véase: <u>Pueblo</u> v. <u>López Guzmán</u>, 131 D.P.R. 867, 887 (1992) citando a <u>Pueblo</u> v. <u>Cruz Correa</u>, ante, a las págs. 276-78; <u>Pueblo</u> v. <u>Bonilla</u>, ante, a la pág. 439. Ello implica que tendrá la última palabra no sólo en cuanto a la culpabilidad o inocencia del imputado, sino que, además, será el que determine --en caso de entender que el acusado incurrió en responsabilidad en relación con los hechos que se le imputan-- el delito específico, o el grado del mismo, por el cual éste debe responderle a la sociedad. <u>Pueblo</u> v. <u>Cruz Correa</u>, ante, a la pág. 277; <u>Pueblo</u> v. <u>Bonilla Ortiz</u>, ante, a la pág. 439. En resumen, su función comprende evaluar la evidencia que sea presentada y admitida por el tribunal durante el juicio y llegar a las conclusiones de hechos correspondientes. Luego, aplicando el derecho, <u>según le es instruido por el juez que preside el proceso</u>, deberá

emitir un veredicto. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, ante, a las págs. 319-320. Es también el jurado el llamado a aquilatar la prueba desfilada y a quien le corresponde decidir si le da crédito o no a la misma. Pueblo v. Lorio Ormsby, ante, a las págs. 727-29.

Ahora bien, en vista de que el jurado está compuesto de personas desconocedoras del ordenamiento jurídico, para que éstos puedan desempeñar su función a cabalidad se requiere que sea correctamente instruido sobre el derecho aplicable por el juez que presida el proceso. Pueblo v. Lorio Ormsby, ante, a la pág. 727; Pueblo v. Bonilla Ortiz, ante, a la pág. 439; Pueblo v. Cruz Correa, ante, a la pág. 277; Pueblo v. Ortiz Martínez, 116 D.P.R. 139, 150 (1986). De este modo, las instrucciones al jurado son el mecanismo procesal a través del cual el jurado tomará conocimiento del derecho aplicable al caso.[23] Pueblo v. Landmark, 100 D.P.R. 73, 79 (1971).

En varias ocasiones hemos enfatizado la importancia de las instrucciones que el juez debe transmitir al jurado. Pueblo v. Tufiño Cruz, 96 D.P.R. 225, 229 (1968); Pueblo v. Burgos Dávila, 76 D.P.R. 199, 202 (1954); Pueblo v. Méndez, 74 D.P.R. 913 (1953). En términos generales, el acusado tiene derecho a que se le transmita al jurado todos los

_____

[23] Véase, además: Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, ante, a la pág. 330.

aspectos de derecho que, bajo cualquier teoría razonable, pudieran ser pertinentes en las deliberaciones, ello aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. Pueblo v. Acevedo Estrada, res. el 19 de enero de 2000, 2000 TSPR 8; Pueblo v. Miranda Santiago, 130 D.P.R. 507, 518 (1992); Pueblo v. Tufiño Cruz, ante. Esto es así ya que "corresponde al jurado y no al tribunal rendir un veredicto conforme a la ley y los hechos del caso, según aquél aquilate la prueba y determine los hechos." Pueblo v. González Colón, 110 D.P.R. 812, 815 (1981).

Las instrucciones deben incluir los elementos del delito imputado,[24] haciendo hincapié en que el ministerio fiscal tiene la carga probatoria de establecer todos los elementos del mismo más allá de duda razonable. También debe incluirse instrucciones sobre la forma de culpabilidad exigida para ese delito, es decir, sobre la intención o negligencia criminal requerida. Véase, Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, ante, a las págs. 331-32. Ello en vista de que el estado mental o "mens rea" es un elemento subjetivo que le corresponde determinar al jurado a la luz de los hechos. Pueblo v. Bonilla Ortiz, ante, a las págs. 441-42.

---

[24] Véase, Pueblo v. Lorio Ormsby, ante, a la pág. 727; Pueblo v. Bonilla Ortiz, ante, a la pág. 439; Pueblo v. González Colón, ante, a la pág. 815.

Además, las instrucciones deben cubrir los elementos de aquellos delitos inferiores al imputado o comprendidos dentro de éste; ello siempre y cuando la prueba así lo justifique. Véase: Pueblo v. Rodríguez Santana, 146 D.P.R. 860, 886 (1998); Pueblo v. Lorio Ormsby, ante, a la pág. 727; Pueblo v. González Colón, ante, a la pág. 815.[25] Esto es, una instrucción sobre delitos inferiores no le será transmitida al jurado de forma automática, sino que, es necesario que exista evidencia de la cual el jurado pueda razonablemente inferir que el acusado es culpable del delito inferior. Véase: Pueblo v. Saltari Crespo, 53 D.P.R. 893, 910 (1938).

Vemos pues, que el fundamento para impartirle al jurado una instrucción sobre delito inferior es que la misma esté apoyada en prueba que la justifique. El problema es determinar qué implica el que "la prueba justifica las instrucciones". Sobre este particular se ha expresado que:

> [E]sto sólo puede significar que haya evidencia admitida, que de ser creída por el jurado, sería suficiente como cuestión de derecho penal sustantivo, para que el acusado prevalezca. El juez no debe aquí hacer juicio de credibilidad alguno para no impartir la instrucción, pues estaría usurpando funciones del jurado, en

---

[25] Véase, además: Pueblo v. López Guzmán, ante, a la pág. 887, citando a Pueblo v. Cruz Correa, ante, a la pág. 277; Pueblo v. Bonilla Ortiz, ante, a la pág. 439; Pueblo v. Tufiño Cruz, ante, a la pág. 229; Pueblo v. Burgos Dávila, ante, a la pág. 202.

violación del derecho constitucional del acusado a juicio por jurado. . . . [26]

Ahora bien, la facultad que la ley le concede al jurado <u>no puede ser ejercitada caprichosa o arbitrariamente</u>. Véase: <u>Pueblo</u> v. <u>Saltari Crespo</u>, ante, a la pág. 910. A esos efectos hemos expresado que:

> El veredicto que reduzca el grado de delito <u>debe estar fundado en evidencia tendente a demostrar o capaz de producir duda razonable sobre la existencia del delito inferior</u>; y si esa evidencia <u>no</u> existe, <u>ni</u> el juez puede transmitir instrucciones sobre el delito inferior, <u>ni</u> el jurado puede traer un veredicto reduciendo el grado del imputado en la acusación. *Ibid* (énfasis suplido).

Es por ello que un juez <u>actúa correctamente</u> al denegar una instrucción sobre un delito menor incluido <u>si estima que la evidencia, aun pudiendo ser creída por el jurado, resulta insuficiente en derecho para establecer la comisión del referido delito</u>.[27] Chiesa Aponte, <u>Derecho</u>

---

[26] Chiesa Aponte, <u>Derecho Procesal Penal de Puerto Rico y Estados Unidos</u>, ante, a la págs. 332; véase, además: <u>Pueblo</u> v. <u>Tufiño Cruz</u>, ante, a la pág. 230.

[27] A conclusión similar se ha llegado en la jurisdicción norteamericana y a esos efectos se ha sostenido que:

> For the trial court to give such a charge under those circumstances <u>is inappropriately to invite the jury to exercise a degree of mercy by finding defendant guilty of a lesser crime, when the proof truly justified conviction as charged</u>. When there is no evidentiary basis for the lesser charge, a judge is not required to charge the jury on that offense. . . . This rule assumes that the defendant <u>has no constitutionally protected right to present to the jury the option of nullification in the form of a lesser included</u>

(Continúa ...)

Procesal Penal de Puerto Rico y Estados Unidos, ante, a la pág. 332.

Refiriéndonos, específicamente, a la procedencia de una instrucción sobre el delito de homicidio en un procedimiento seguido contra un acusado por el delito de asesinato hemos expresado, desde Pueblo v. Galarza, 71 D.P.R. 557, 561-62 (1950), que:

> No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún indicio de prueba a ese efecto, el jurado es el llamado a aquilatar la misma. De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio ... es al jurado que incumbe determinar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fue homicidio ... y no asesinato.[28]

No obstante lo anterior, hemos sido enfáticos en que el tribunal sentenciador no debe transmitir instrucciones de homicidio si los autos carecen de evidencia que justifique tal veredicto. Véase: Pueblo v. Moreno Morales I, 132 D.P.R. 261, 283 (1992); Pueblo v. Torres Rodríguez, 119 D.P.R. 730, 744 (1987); Pueblo v. Padros García, 99

_____

offense. LaFave, Israel & King, Criminal Procedure, 2da. ed., West Group, 1999, Vol. 5, sec. 24.8(f), pág. 587 y casos allí citados (énfasis nuestro y notas al calce omitidas).

[28] (Énfasis nuestro y citando con aprobación a Stevenson v. U.S., 162 U.S. 313, 314 (1896). Véase, además: Pueblo v. Moreno Morales I, 132 D.P.R. 261, 283 (1992); Pueblo v. López Guzmán, ante, a la pág. 888; Pueblo v. Cruz Correa, ante, a la pág. 277; Pueblo v. González Colón, ante, a las págs. 815-16; Pueblo v. Torres Rodríguez, 119 D.P.R. 730, 741-42 (1987).

D.P.R. 384, 395 (1970); Pueblo v. Serbiá, 75 D.P.R. 394, 398 (1953). Fomentar dicha práctica equivaldría a autorizar al jurado a que imponga un castigo diferente al prescrito para el delito que de hecho se cometió. *Ibid*.

En el caso de autos, el recurrido plantea que la prueba presentada en el juicio no sostiene el veredicto de asesinato en segundo grado, sino que la misma justificaba plenamente que se transmitiera al jurado una instrucción sobre el delito de homicidio voluntario. Argumenta que la muerte de la joven fue producto de un alegado arrebato de cólera al éste advenir en conocimiento de la muerte de su supuesto pariente y que en su actuación no hubo malicia ni premeditación que justificara la denegatoria de la referida instrucción. No le asiste la razón; veamos por qué.

III

Como es sabido el Artículo 85 del Código Penal de Puerto Rico dispone que comete el delito de homicidio "[t]oda persona que matare a otra en ocasión de súbita pendencia o arrebato de cólera..." 33 L.P.R.A. sec. 4004. Los elementos de este delito son: dar muerte a un ser humano, como consecuencia de una pendencia súbita o de un arrebato de cólera, causado por una provocación adecuada de parte de la víctima. Pueblo v. Rivera Alicea, 125 D.P.R. 37, 46 (1989); Pueblo v. Cruz Correa, ante, a la pág. 279. Se trata de un acto intencional e ilegal que causa la muerte, pero por existir circunstancias atenuantes la

calificación del delito y la pena varían en beneficio del acusado.[29] La circunstancia atenuante consiste en que el acto del acusado fue una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta. *Ibid.*

El homicidio se comete sin que medie reflexión y premeditación; esto es, sin un previo plan para matar. Pueblo v. Moreno Morales I, ante, a la pág. 284. Del mismo modo, el elemento de maldad o malicia está ausente en este delito. Pueblo v. Negrón Caldero, res. el 28 de junio de 2002, 2002 TSPR 95. Estas características son las que, precisamente, diferencian al homicidio del asesinato en primer y segundo grado. Véase, Pueblo v. Gómez Nazario, 121 D.P.R. 66, 73 (1988); Pueblo v. Orlando González, 120 D.P.R. 684, 689 (1988).

El homicidio presupone que el autor de la muerte actuó movido por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar bajo impulsos mentales causados por cólera, pendencia o emoción violenta. Véase: Pueblo v.

---

[29] A esos efectos se ha reconocido en la jurisdicción norteamericana que "[i]t is not the purpose of the law to unbridle human passions. On the contrary, one very important aim of the criminal law is to induce persons to keep their passions under proper control. At the same time the law does not ignore the weaknesses of human nature. Hence as a matter of common law an unlawful killing may even be intentional and yet of a lower grade than murder". Perkins & Boyce, Criminal Law, 3ra. ed., New York, Foundation Press, Inc., 1982, pág. 84 (nota al calce omitida).

Negrón Caldero, ante; Pueblo v. Moreno Morales I, ante, a
las págs. 283-84; Pueblo v. Rivera Alicea, ante, a la pág.
46; Pueblo v. Cruz Correa, ante, a la pág. 279. Sin
embargo, la sed de venganza nunca será suficiente para
catalogar el delito como un homicidio. La Fave & Scott,
Substantive Criminal Law, Minnesota, West Publishing Co.,
1986, Vol. 2, sec. 7.10(a), pág. 255; Witkin & Epstein,
California Criminal Law, 2da. ed., California, Bancroft-
Whitney Co., 1988, Vol. 1, sec. 515, pág. 582. Asimismo,
hemos sostenido que "[s]i no existe esa provocación o si
habiendo existido [la misma] no es lo suficientemente
grave y la actuación del matador está fuera de toda
proporción con el grado de la provocación, el acto de dar
muerte constituye asesinato aunque el acusado no hubiese
preconcebido la idea." Pueblo v. Lebrón, 61 D.P.R. 657,
667 (1943)(énfasis nuestro).

De lo anterior se desprende que para determinar la
posible comisión del delito de homicidio hay que
identificar, al menos, tres factores. Éstos son: (i) que
la muerte haya ocurrido mientras el actor se encontraba en
un arrebato de cólera o pendencia súbita ("heat of
passion"); (ii) que la muerte estuviere precedida de una
provocación adecuada; y (iii) que la muerte haya ocurrido
antes de que el arrebato o pendencia sufrida por el actor
razonablemente se hubiere enfriado ("cooling off

period").[30] Perkins & Boyce, Criminal Law, 3ra. ed., New York, Foundation Press, Inc., 1982, pág. 85; La Fave & Scott, Criminal Law, Minnesota, West Publishing Co., 1982, pág. 573; Torcia, Wharton's Criminal Law, 15ta. ed., New York, Clark Boardman Callaghan, 1994, sec. 166, págs. 367-69.

Ahora bien, cuando hablamos del delito de asesinato nos referimos a un solo delito consistente, el mismo, en "dar muerte a un ser humano con malicia premeditada." Véase, Artículo 82 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4001. Éste, a su vez, se divide en grados atendiendo a la perversidad demostrada por el acusado al cometer el acto y al sólo efecto de la imposición de la pena. Pueblo v. Rivera Alicea, ante, a la pág. 44; Pueblo v. Pérez Martínez, 84 D.P.R. 181, 184 (1961). El asesinato es un delito que, por su definición y naturaleza, conlleva un acto perverso, malintencionado y contrario a los valores éticos y morales de nuestra sociedad. Denota un estado o condición en el actor, compuesto por una deficiencia inherente en su sentido de moral y rectitud, ello como resultado de haber dejado de preocuparse por el respeto y la seguridad de la vida humana. Rivera Pagán v. Supte. de la Policía, 135 D.P.R. 789, 800 (1994).

---

[30] Sobre este último factor, véase, Pueblo v. Reyes Lara, 100 D.P.R. 676 (1975); Pueblo v. Román Marrero, 96 D.P.R. 796 (1968).

En cuanto a los grados de asesinato observamos que la diferencia radica en que el asesinato en primer grado requiere, aparte de la malicia premeditada, el elemento de la deliberación; mientras que en el asesinato en segundo grado la muerte es maliciosa y premeditada, pero la deliberación está ausente. Véase, Artículo 83 del Código Penal, 33 L.P.R.A. sec. 4002; Pueblo v. Gómez Nazario, ante, a la pág. 73; Pueblo v. González Pagán, ante, a la pág. 689. Esto es, el asesinato en primer grado se caracteriza por la deliberación y la intención específica de matar. Pueblo v. Méndez, 74 D.P.R. 913, 926 (1953). Ello a diferencia del asesinato en segundo grado en el cual basta la malicia premeditada, sin intención específica para matar; es decir, se refiere a la intención de realizar un acto o producir un grave daño corporal que con toda probabilidad resultará en la muerte de una persona. Pueblo v. Méndez, ante; Pueblo v. Blanco, 77 D.P.R. 767, 775 (1954).

La malicia premeditada, que es el elemento mental requerido en el delito genérico de asesinato, implica la ausencia de justa causa o excusa y conciencia al ocasionar la muerte de un semejante. Pueblo v. Carmona, Rivera, 143 D.P.R. 907, 914 (1997); Pueblo v. Robles González, 132 D.P.R. 554, 563 (1993); Pueblo v. Rivera Alicea, ante, a la pág. 45. Por otro lado, la deliberación es la resolución o decisión de matar, después de darle alguna

consideración. Véase: Pueblo v. Rosario, 67 D.P.R. 371, 375 (1967).

Ello no obstante, cualquier período de tiempo, por corto que sea, será suficiente para que pueda tener lugar la deliberación. Incluso, hemos sostenido que ese lapso puede ser tan rápido como el pensamiento. Véase: Pueblo v. Echevarría Rodríguez I, ante, a la pág. 368 n. 59; Pueblo v. Rosario, ante. Esto es, tanto la deliberación como la malicia premeditada no requieren necesariamente de un plan previo ni que se conciban con mucho tiempo de antelación a los hechos. Pueblo v. Echevarría Rodríguez I, 128 D.P.R. 299, 368 (1991). No tiene que transcurrir determinado período de tiempo entre la intención de matar y la muerte misma ya que ambos elementos pueden concebirse en el momento mismo del ataque. Véase: Pueblo v. González Pagán, ante, a la pág. 689; Pueblo v. López Rodríguez, 101 D.P.R. 897, 899 (1974). A esos efectos hemos expresado que "la premeditación [y la deliberación] puede[n] formarse en un instante antes del acto, y puede[n] existir ... no obstante la rapidez con que el acto se haya realizado." Pueblo v. Méndez, ante, a la pág. 921.

Por otra parte, la deliberación y la malicia son elementos subjetivos que, de ordinario, no pueden probarse con evidencia directa por lo que, en ocasiones, es preciso recurrir a los hechos del caso para determinar si de ellos razonablemente pueden inferirse. Pueblo v. López Rodríguez, ante, a las págs. 898-99; Pueblo v. Rosario,

ante, a la pág. 375. Estos elementos pueden deducirse a base de los actos y las circunstancias que rodearon la muerte; la relación entre las partes; la capacidad mental, motivación, manifestaciones y conducta del acusado; así como de los hechos anteriores, concomitantes y posteriores al crimen. Véase, Artículo 14 del Código Penal, 33 L.P.R.A. sec. 3061; Pueblo v. Carmona, Rivera, ante, a las págs. 914-15; Pueblo v. Moreno Morales I, ante, a la pág. 287; Pueblo v. Rivera Alicea, ante, a la pág. 45; Pueblo v. López Rodríguez, ante, a la pág. 899. "'Una intención maliciosa y criminal se presume por la manera ... [en] que ... se comet[e] un acto ilegal con el propósito de perjudicar a otro.'" Pueblo v. Carmona, Rivera, ante, a la pág. 915 citando a Pueblo v. Santiago, 54 D.P.R. 167, 171 (1939) (énfasis nuestro).

Cónsono con lo anterior, este Tribunal ha reconocido varias instancias en las que fácilmente se puede inferir la malicia premeditada y/o la deliberación. A modo de ejemplo, podemos señalar: el acto de atacar a una persona con una arma mortífera ya que, del uso de la misma, puede inferirse la intención de matar o causar daños cuya consecuencia probable es la muerte;[31] atacar con una arma a

---

[31] Véase, Pueblo v. Carmona, Rivera, ante, a la pág. 915; Pueblo v. Bonilla Ortiz, ante, a la pág. 442; Pueblo v. Colón Soto, 109 D.P.R. 545, 548 (1980); Pueblo v. Méndez, ante, a la pág. 931.

una persona desarmada;[32] dispararle a la víctima en más de una ocasión, a corta distancia y alcanzándola en la cara;[33] dispararle a la víctima dos tiros con un arma de fuego y luego acercársele para dispararle tres veces más mientras le dice "para acabar contigo";[34] ultimar a balazos a la víctima luego de que ésta retrocediera y rogara para que no le disparara;[35] cuando sin mediar palabras el acusado le dispara a unos jóvenes y mata a uno de ellos;[36] cuando sin mediar palabras el acusado le dispara tres tiros a un policía que le ordenó detenerse;[37] inferirle numerosas heridas punzantes a la víctima atacándola por la espalda;[38] apuñalar al occiso mientras otro lo agarra.[39]

Como expresáramos antes, son precisamente los elementos de malicia y deliberación los que distinguen un asesinato de un homicidio. Para determinar si, en casos como el presente, la prueba justificaba impartir la instrucción sobre homicidio debemos, en primer lugar,

---

[32] Véase, Pueblo v. Moreno Morales I, ante, a la pág. 287; Pueblo v. Rivera Alicea, ante, a la pág. 45.

[33] Véase, Pueblo v. Rivera Alicea, ante.

[34] Véase, Pueblo v. Guzmán Toro, 107 D.P.R. 700 (1978).

[35] Véase, Pueblo v. Torres Montañez, 106 D.P.R. 125 (1977).

[36] Véase, Pueblo v. Velázquez Caraballo, 110 D.P.R. 369 (1980).

[37] Véase, Pueblo v. Caballero Rodríguez, 109 D.P.R. 127 (1979).

[38] Véase, Pueblo v. Dingui Ayala, 103 D.P.R. 528 (1974).

[39] Véase, Pueblo v. Garay, 105 D.P.R. 86 (1976).

examinar la misma para ver si en la actuación del acusado, al momento de matar a la joven, hubo elementos de malicia y/o deliberación, característicos del delito de asesinato, y, en segundo término, para determinar si, independientemente del hecho de la existencia de malicia y premeditación, se presentó prueba que justificaba, o hacia mandatoria, la instrucción al jurado sobre el delito de homicidio voluntario.

## IV

## – A –

Un análisis objetivo, y sereno, de la evidencia que desfilara ante el juzgador de los hechos a nivel de instancia nos convence del hecho de que el Estado presentó prueba, más allá de duda razonable, de todos y cada uno de los elementos del delito por el cual fue convicto el recurrido Rosario Orangel; esto es, del delito de asesinato en segundo grado.[40]

Como se recordará, el testimonio de los testigos fue a los efectos de que el 7 de diciembre de 1998 la agente Milagros Agosto Pérez, de veintitrés años, se encontraba en la casa de una amiga en la Barriada Israel en Hato Rey entallándose unos pantalones de su uniforme. Estando allí se escucharon unas detonaciones por lo que, inmediatamente

---

[40] De hecho, somos del criterio que, incluso, existe prueba suficiente en derecho para sostener una convicción por el delito de asesinato en primer grado, de éste haber sido el veredicto rendido por el jurado.

y en cumplimiento de su deber, la joven salió a investigar lo ocurrido con su arma de reglamento en la mano derecha, vestida de civil. Conforme a dichos testimonios, aproximadamente diez minutos más tarde, se escuchó una segunda ráfaga de disparos --hechos por Rosario Orangel-- que causaron la muerte de la joven policía.

Este lapso de tiempo, ocurrido entre las dos rondas de disparos, obviamente fue utilizado por Rosario Orangel para apoderarse o armarse del rifle con el cual ultimó a la joven; lapso de tiempo más que suficiente para poder configurarse, en la mente de Rosario Orangel, la intención de matar o, al menos, la de producir grave daño corporal y la malicia premeditada requeridas en el delito de asesinato en segundo grado.

Por otra parte, la malicia premeditada en la actuación del recurrido claramente puede deducirse de la forma y manera en que perpetró el crimen, según ello surge del Informe Médico-Forense y del testimonio del patólogo forense que realizó la autopsia. Fueron seis las heridas de bala recibidas por la occisa. Algunas de ellas --las más graves-- fueron disparadas a corta distancia. Es de notar que éstas --una de las cuales le alcanzó la cabeza-- eran "de contacto" y tenían una trayectoria de abajo hacia arriba, compatibles con la situación de que la víctima estuviera ya tirada en el piso o en proceso de caer al mismo al momento de recibirlas. Otras le fueron inferidas por la espalda; en particular, una entró precisamente por

la parte posterior del hombro derecho en cuya mano tenía, la occisa, agarrada su arma.

Si a ello le añadimos el hecho de que con posterioridad a la comisión del acto delictivo, el recurrido Rosario Orangel huyó del lugar y luego trató de borrar evidencia incriminatoria, al lavarse las manos con cloro, no hay duda de que nos enfrentamos a una persona, actuando de forma calculada y fría, con corazón perverso y la mente culposa. Todas las anteriores circunstancias son, a nuestro juicio, claramente incompatibles con la existencia de un estado de arrebato de cólera que nubla el entendimiento e inhibe la razón, característico de la persona que comete el delito de homicidio voluntario.[41]

– B –

Ahora bien, e independientemente de lo antes expresado, ¿existe prueba en el récord que justifique, o hiciera mandatoria, la instrucción al jurado sobre el delito de homicidio voluntario en el presente caso?

El recurrido Rosario Orangel sostiene que sí. Entiende que de las meras expresiones "mi hermano, mi hermano", que una de las testigos alegó que él profirió, así como de la declaración de la novia de un sobrino suyo,

---

[41] Desde hace ya varias décadas, incluso, expresamos que "cuando claramente aparece demostrado por la prueba que no se trata de un delito de homicidio, sino de un asesinato, no tiene necesidad el juez de dar instrucciones referentes al delito de homicidio." Véase: Pueblo v. Rodríguez, 34 D.P.R. 464, 466 (1925) (énfasis nuestro).

a los efectos de que él le comentó que "est[aba] encojonao" y que "breg[ó] con la mujer policía porque ... pens[ó] que había matado a Peña", podía inferirse el arrebato de cólera que requiere el delito de homicidio para configurarse. <u>No estamos de acuerdo</u>. Somos del criterio que dichas expresiones no hacen mandatoria una instrucción al jurado sobre el referido delito.

Entendemos que estas manifestaciones son insuficientes para que razonablemente se pueda inferir que el recurrido pudo haber cometido el delito de homicidio. El mero hecho de gritar "mi hermano, mi hermano" y que, cuatro días con posterioridad a la ocurrencia de los hechos, haya manifestado que estaba "encojonao" <u>no</u> son suficientes para reflejar el arrebato colérico, súbito y pasional que, como vimos, son elementos constitutivos y necesarios del referido delito. De ellas tampoco surge la reacción impulsiva e irreflexiva característica del mismo. Esas manifestaciones nos recuerdan las expresiones que hizo el acusado en <u>Pueblo</u> v. <u>Calderón</u>, 50 D.P.R. 336, 342 (1943) al exclamar *Lo hice porque me traía molesto; tuve que hacerlo porque me traía molesto*". En aquella ocasión este Tribunal concluyó que de esa prueba no se desprendía la existencia del arrebato de cólera que la ley considera suficiente para disminuir el delito de asesinato a homicidio. *Ibid*. a la pág. 344.

Por otro lado, la defensa del recurrido sostiene que la actuación de éste fue producto de haber visto y/o

advenido en conocimiento de la muerte del joven José Peña, quien supuestamente era pariente suyo. Alega que este evento constituyó una provocación adecuada que permite catalogar el delito como un homicidio.

Ciertamente, es posible que, en ocasiones, el evento de ver o conocer de la muerte de un familiar cercano pueda constituir una provocación adecuada capaz de producir un arrebato de cólera que justifique reducir el delito de asesinato a homicidio.[42] Ahora bien, ello nunca podría ser, o convertirse en, una norma absoluta que implique que en todo caso en que el acusado presencie o se enteré de la muerte de un pariente el delito de asesinato quedará automáticamente reducido a homicidio; ello sin examinar el resto de las circunstancias que rodearon la muerte. No hay duda, repetimos, de que habrán ocasiones en que un evento de esa índole, unido al resto de las circunstancias, constituirá provocación adecuada capaz de producir un arrebato de cólera, pero habrá otras en que no lo será. Como consecuencia, no podemos adoptar, como pretende la representación legal del recurrido, una norma para que en todo caso de esta naturaleza los tribunales de instancia vengan obligados a transmitirle al jurado instrucciones pertinentes al delito de homicidio.

---

[42] Véase, Pueblo v. Arroyo, 61 D.P.R. 411, 415 (1943); Perkins & Boyce, Criminal Law, ante, a la pág. 97; Torcia, Wharton's Criminal Law, ante, sec. 163, pág. 363; Witkin & Epstein, California Criminal Law, ante, sec. 513, pág. 580; La Fave & Scott, Substantive Criminal Law, ante, sec. 7.10(b), pág. 256.

De todos modos, en el presente caso, ni siquiera existe certeza del verdadero parentesco, si alguno, entre el recurrido y el joven José Peña. Como señalamos, de la prueba surgen inconsistencias y dudas en cuanto a la relación entre ambos ya que en ocasiones se hace referencia a Peña como hermano, en otras como sobrino y, en otras, como primo del aquí recurrido. Por otro lado, en los alegatos presentados por las partes tampoco se ha clarificado este aspecto. En vista de que la defensa no nos ha puesto en una posición que nos permita estar seguros de la relación familiar existente, si alguna, entre Peña y el recurrido, resulta innecesario examinar si el evento de ver y conocer de la muerte de Peña era capaz de producir en el recurrido un arrebato de cólera tal que justificara impartir la instrucción de homicidio.[43]

En resumen, somos del criterio que los hechos hoy ante nuestra consideración no son indicativos de una persona actuando bajo los efectos de un arrebato de

---

[43] Además, la declaración hecha por la novia de un sobrino del recurrido a los efectos de que éste le dijo que mató a la mujer policía porque creía que ella había matado a su pariente es de dudosa confiabilidad y requiere ser examinada con cautela porque aparenta ser una declaración "self-serving", sino en todo, al menos en parte. Como es sabido, las declaraciones que son totalmente en beneficio del acusado o "self-serving" deben ser excluidas y si sólo son beneficiosas en parte, dicha porción de la declaración también debe excluirse. Pueblo v. Mendoza Lozano, 120 D.P.R. 815 (1988); Pueblo v. Tirado de Santos, 91 D.P.R. 210 (1964); véase, además: E.L.Chiesa Aponte, Tratado de Derecho Probatorio, 2000, T.II, págs. 748-52. No obstante lo anterior, no indagaremos sobre este aspecto en vista de que las partes no lo han cuestionado ni se opusieron oportunamente a la admisibilidad de dicha declaración.

cólera. Por el contrario, entendemos que los mismos claramente demuestran que estamos ante una muerte causada por una persona que actuó, fría y calculadamente, y con sed de venganza; sentimiento que nunca podrá justificar una instrucción por el delito de homicidio voluntario.

En vista de lo antes expuesto, la única instrucción que realmente estaba justificada por la prueba fue la que, precisamente, se le transmitió al jurado: la del delito de asesinato y sus distintos grados. Por tanto, actuó correctamente el juez de instancia al negarse a impartirle al jurado una instrucción sobre el delito de homicidio voluntario.

Procede en consecuencia, modificar y revocar la sentencia emitida por el Tribunal de Circuito de Apelaciones únicamente en cuanto la misma dejó sin efecto la convicción del recurrido Rosario Orangel por el delito de asesinato en segundo grado, reinstalándose dicha convicción y confirmándose la referida sentencia en cuanto a los otros extremos.

Se dictará Sentencia de conformidad.


FRANCISCO REBOLLO LÓPEZ
Juez Presidente Interino

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

        vs.                    CC-2001-1025     CERTIORARI

Edward Rosario Orangel

    Acusado-recurrido

SENTENCIA

San Juan, Puerto Rico 5 de noviembre de 2003

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia modificatoria de la emitida en el presente caso por el Tribunal de Circuito de Apelaciones, únicamente en cuanto la misma dejó sin efecto la convicción del recurrido Rosario Orangel por el delito de asesinato en segundo grado, reinstalándose dicha convicción y confirmándose la referida sentencia en cuanto a los otros extremos.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señor Fuster Berlingeri y señor Rivera Pérez disienten sin opinión escrita.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo