Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| EL PUEBLO DE PUERTO RICO<br><br>*Apelado*<br><br>v.<br><br>LUIS A. RIVERA MATOS<br><br>*Apelante* | KLAN202400801 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Caso Núm.:<br>NSCR202300086<br>NSCR202300087<br><br>Sobre:<br>Art. 99 (E) C.P.<br>Art. 6.14 (B) L.A. |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de enero de 2026.

Comparece ante nos el señor Luis A. Rivera Matos (apelante o señor Rivera Matos), mediante el recurso de epígrafe, y nos solicita que revoquemos las sentencias dictadas en su contra el 6 de agosto de 2024 por el Tribunal de Primera Instancia, Sala Superior de Fajardo (TPI o foro apelado). Mediante dichos dictámenes, el foro apelado encontró culpable al apelante de un cargo por el Artículo 93 (e) del Código Penal[1], un cargo por el Artículo 6.14 (B) de la Ley de Armas de Puerto Rico[2] y lo condenó a cumplir un total de ciento nueve (109) años de cárcel.

Por los fundamentos que exponemos a continuación, **confirmamos** las *Sentencias* apeladas. Veamos.

**I.**

Por hechos ocurridos el 31 de agosto de 2021, el Ministerio Público presentó seis denuncias[3] contra el señor Rivera Matos por los siguientes delitos: Artículo 93 (e) del Código Penal, *supra* y

---

[1] 33 LPRA sec. 5142.
[2] 25 LPRA sec. 466m.
[3] Expediente Original.

Número Identificador

SEN2026_____

Artículo 6.14 de la Ley de Armas, *supra*. Según las denuncias presentadas, el 31 de agosto de 2021, el apelante, a propósito, y con conocimiento, le ocasionó la muerte a Damaris Ortiz Rosario, con quien estaba legalmente casado, realizándole varios disparos con un arma de fuego, provocándole la muerte en el acto.

Luego de los trámites preliminares, el 26 de febrero de 2024 dio inicio el juicio por jurado[4]. Antes de comenzar con los procedimientos, se marcó la prueba como exhibits, a saber: **núm. 1** el croquis, **núm. 2** registro de evidencia en escena, **núm. 3** solicitud de servicio es el forense alterno, solicitud de servicio forense alterna AF 21-1202, **núm. 4** Solicitud de servicio forense alterna DNAS 210818, **núm. 5** solicitud de servicio forense AF21-1202 con cadena de custodia, **núm. 6** Solicitud de servicio forense, DNAS 210818, **núm. 7** son sesenta (60) fotos de escena y arma, de la A la triple F. Las fiscales Banessa Marcano Camis (fiscal Marcano) y Lenabel Alvarado De García (fiscal Alvarado) informaron al TPI que, de 60 fotos, solo una no fue estipulada por el apelante, por entender que era inflamatoria[5].

La representación legal del apelante constaba de los licenciados Augusto Sánchez Tirado (Lcdo. Sánchez) y Francisco Esquilín Márquez (Lcdo. Esquilín). Con relación a la foto no estipulada, el Lcdo. Sánchez argumentó que existen otras fotos que reflejan ser menos inflamatoria que esa[6]. Que su "fundamento está basado en la Regla 403 de las Reglas de Evidencia de Puerto Rico, específicamente, los incisos (a), (c) y (e)[7]; riesgo de causar perjuicio indebido, riesgo de causar desorientación del jurado al examinar esa foto; además que es innecesaria presentar esa foto porque sería prueba acumulativa". Tras escuchar los argumentos de las partes y

---

[4] Transcripción de la Prueba Oral (TPO), págs. 4-5.
[5] TPO págs. 5 y 6.
[6] TPO págs. 6.
[7] 32 LPRA AP VI, R. 403.

observar la foto en controversia, el juez determinó que se marcara la foto como exhibit **núm. 10** unido al exhibit núm. 7[8]. Además, se marcaron los exhibits **núm. 8** A, B y C, el **8A** es el arma con abastecedor, el **8B** son 13 balas y un abastecedor y el **8C** son proyectiles y sus 24 derivados y 5 casquillos de balas disparados de un arma 9 milímetros, el exhibit **núm. 9** consta de A y B, el **9A** son dos aplicadores con manchas de sangre numerados 2 y 6 y dos piezas de dentadura y el **9B** es el aplicador con corrector bucal.

Luego de haber marcado la prueba, el foro apelado continuó con la lectura de las acusaciones[9] e impartió las instrucciones generales, para así dar comienzo a la presentación de los testigos. El Ministerio Público comenzó el desfile de prueba con el testigo de servicios técnicos, José Rivera Reyes. A continuación, procedemos a realizar un breve resumen relevante a la controversia presentada por el apelante, en específico, si el TPI erró al negarse a instruir al jurado sobre asesinato atenuado y el asesinato en segundo grado.

### José Rivera Reyes

Declaró que trabajaba para la Policía de Puerto Rico y que para la fecha de los hechos estaba adscrito a la División de Servicios Técnicos del CIC de Fajardo. Explicó en qué consistía su trabajo, qué realizó durante la escena, y como recolectó la evidencia que fue identificada mediante los exhibits marcados previamente por el TPI. Durante el directo, la fiscal Marcano peguntó:

> **Fiscal Marcano**: Bien. Entonces, mostrándole el "Exhibit" 7BBB, ¿qué refleja?
> **Testigo**: Eso es un taser que se asigna a la policía, es un dispositivo eléctrico para controlar a las personas un ejemplo, si estamos en una situación de peligro, pues nos adiestran en la policía para usar el taser, ya que, si no, es el nivel de violento que esté la persona o cómo se puede controlar, puede ser un taser, o puede ser hasta lo más fatal, puede ser hasta un arma de fuego.
> **Fiscal Marcano**- ¿De dónde... o sea, dónde estaba ese dispositivo electrónico cuando usted le tomó esa fotografía?

---

[8] TPO, págs.7-11.
[9] TPO, pág.9.

**Testigo**: Ahí no recuerdo… estaba cerca de es una mesita de concreto, no sé si era del agente que lo utilizó, se le tomó una foto del mismo.
**Fiscal Marcano**: Con respecto a eso, le pregunto, a propósito, si usted sabe la procedencia de ese taser y para qué se usó.
**Testigo**: Indicaron que se usó para…
**Lcdo. Sánchez**: Juez tenemos objeción[10].
**Fiscal Marcano**: La pregunta fue si usted lo sabe, no si le dijeron. Si usted como la fotografío, ¿usted sabía para qué lo usaron?
**Testigo**: Sí, que lo utilizaron en la escena para controlar a la persona.

Respecto a la línea de preguntas sobre el taser, el Lcdo. Sánchez, en su turno de contrainterrogatorio, preguntó lo siguiente:

**Contrainterrogatorio**:

**Lcdo. Sánchez**: Si y como parte de su entrenamiento lo que usted le indicó aquí a la compañera fiscal es que se utiliza para una persona descontrolada
¿correcto?
**Fiscal Marcano**: Voy a tener reparo juez.
**Juez**: Fundamento.
**Fiscal Marcano**: Es repetitivo.
**Juez**: Ha lugar.
**Lcdo. Sánchez**: Como parte de su entrenamiento.
**Juez**: La contestación es la misma eso fue lo que le contestó a la fiscal era para controlar a una persona.
**Lcdo. Sánchez**: Y mire a ver si usted cuando una persona está descontrolada es porque no está en sí.
**Fiscal Marcano**: Vamos a objetar.
**Juez**: Fundamento.
**Fiscal Marcano**: Es especulativo.
**Juez:** Ha lugar.
**Lcdo. Sánchez**: Si dentro de su entrenamiento cuando lo utiliza como parte de su entrenamiento cuando usted tiene que hacer uso del taser es porque una persona como usted dijo no sigue instrucciones no está en sí ¿correcto?
**Fiscal Marcano**: Voy a objetar juez.
**Juez**: Fundamento.
**Fiscal Marcano**: Sigue siendo especulativo.
**Juez**: Que conteste si puede si como parte de su entrenamiento le han informado para que el uso del taser específicamente.
**Testigo:** Si el uso del taser es cuando una persona no sigue instrucciones y está descontrolada en una forma que es realmente una herramienta que utilizamos.
**Lcdo. Sánchez:** Y una persona descontrolada que no sigue instrucciones es una persona que no está en sí ¿correcto?
**Fiscal Marcano**: Especulativo Juez.
**Juez**: Ha lugar[11].

### Carlos A. Velázquez Paz

A preguntas de la fiscal Alvarado, testificó que en ese entonces era sargento de la Policía Municipal de Río Grande. También, declaró

---

[10] TPO, págs. 30-31.
[11] TPO, págs. 50-51.

que el 31 de agosto de 2021, se encontraba de turno, recibió una llamada de la policía estatal sobre unas detonaciones de armas de fuego en Estancias del Sol, en la calle Esmeralda, la casa 26, aparentemente había bajado una querella de detonaciones de armas de fuego, ellos nos pidieron cooperación. Que tanto ellos como la policía estatal llegaron juntos al lugar de la querella como tal, entonces, cuando llegamos pues nos encontramos al caballero Matos en la parte de afuera de la casa con un arma de fuego[12].

Referente a la ubicación del apelante, la **Fiscal Alvarado** pregunta:

> **Fiscal Alvarado**: Ok, cuando usted dice que los observó y sale, ¿hacia dónde usted se dirige?
> **Testigo**: El sale hacia atrás, los compañeros salen hacia atrás al verlo con el arma de fuego y yo me voy detrás de la columna, o sea, detrás de la columna, buscando por lo menos, que no me fuera a disparar, cover, lo que le dicen cover.
> **Fiscal Alvarado**: Ok, muy bien, se puede sentar, si está amable. Agente, una vez usted se ubica ahí, voy a retirar este. Una vez usted se ubica ahí, ve que los compañeros se dirigen hacia el área que usted acaba de describir, ¿qué fue lo próximo que usted observó?
> **Testigo**: Yo, cuando voy detrás de la columna, veo al caballero con el arma de fuego, yo empiezo a darle comandos verbales que suelte el arma de fuego, la tenía en la mano izquierda, en la mano derecha tenía una lata que aparentaba ser cerveza, empiezo a darle comandos verbales que suelte el arma de fuego, y él mismo me indica que lo matara, que ya la había matado por puta[13].

Mas adelante,

> **Testigo**: Yo seguí insistiendo, dándole comando, en lo mismo, que soltara el arma de fuego, que cooperara, el mismo seguía expresándome que lo matara, que él quería morir, que lo matara y lo mismo continuamente, lo que me decía era que ya la había matado por puta, que no le importaba que la policía lo matara[14].
> **Fiscal Alvarado**: Con esa pistola que el acusado tenía en sus manos, ¿qué si algo hacía él 14 con ella?
> **Testigo**: Pues cuando él se ve, cuando yo le estaba dando los comandos, que él estaba bebiendo lo que aparentaba ser cerveza, pues agitaba la pistola hacia el frente.
> **Fiscal Alvarado**: Agitaba la pistola hacia el frente.
> **Testigo**: Sí, como si fuera hacia el frente, sí.
> **Fiscal Alvarado**: Por favor, puede, para que conste para récord, puede, si el juez me lo permite, que se levante, pero se quede dentro del misma área de asiento. ¿Cómo era que hacía él con sus manos?
> **Testigo**: Pues él bebía la cerveza y así mismo pues hacía así.
> **Fiscal Alvarado**: Ok.

---

[12] TPO, págs. 55-56.
[13] TPO, pág. 58.
[14] TPO, pág. 59.

**Juez**: Para efecto de la grabación, el sargento está utilizando su mano izquierda para hacer un gesto como si estuviese bebiendo algo y con la mano derecha la está levantando el arma, extendido su brazo a nivel de la altura del hombro[15].

### Contrainterrogatorio

**Lcdo. Sánchez**: Pero lo que usted indicó a las damas y caballeros del jurado hace unos minutos atrás hizo un gesto tomando con la mano izquierda la cerveza y con la mano derecha levantó el arma con la mano derecha. ¿Correcto?
**Testigo**: Sí.
**Lcdo. Sánchez**: ¿Y qué le decía mátenme?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Y usted pudo observar a una persona descontrolada allí, ¿verdad que sí?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Y esa persona que estaba descontrolada no obedecía a los comandos verbales de ustedes, ¿verdad que no?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Pero usted no estaba ubicado frente a la residencia, ¿verdad? frente a ese portón, ¿verdad que no?
**Testigo**: No[16].

La fiscal Alvarado realizó un redirecto pero el mismo no es pertinente sobre la controversia que se encuentra ante la consideración de este panel.

### Agente Carlos J. Bristol Falero.

**Fiscal Alvarado**: Ok. Se dirigieron allá. ¿Qué fue lo próximo que sucedió cuando iban de 2 camino si algo?
**Testigo**: Cuando íbamos de camino, al identificar la calle, que fue lo primero que hicimos, mientras estamos logrando identificar la propiedad, ya que las propiedades no están identificadas, a través del GPS, ni afuera, damos con un vecino en la casa antes, donde ocurrieron los hechos, en una cuesta bajando, él nos deja saber que la casa donde ocurrieron los hechos es la de al lado, posterior a eso, pasamos a la otra residencia. Cuando estamos pasando la residencia, que nos queda a mano derecha, en el caso mío, vemos al caballero, que está descalzo, tez blanca, pantalón color gris, sin camisa, con un arma de fuego en su mano izquierda y una lata de cerveza en su mano derecha[17].
**Fiscal Alvarado**: ¿Qué si algo usted le dijo al acusado[18]?
**Testigo**: Comandos verbales de que bajara el arma de fuego, que bajara el arma de fuego, policía de Puerto Rico, bajé el arma de fuego y uno de los comentarios que él hizo fue, máteme, máteme, ya lo hice.
**Fiscal Alvarado**: Muy bien. ¿Qué si algo además de eso, luego de su comando, él dijo? ¿Si algo?
**Testigo:** Luego de los comandos, lo que dijo fue eso, máteme, máteme, ya lo hice.
**Fiscal Alvarado**: Una vez esa fue la manera de reaccionar, ¿qué fue lo que usted procedió a hacer?
**Testigo**: Posterior a eso, sigo dándole comandos verbales, el caballero insiste en decir lo mismo, próximo a eso, el compañero Cerón, junto con el compañero sargento

---

[15] TPO, pág. 63.
[16] TPO, pág. 68.
[17] TPO, pág. 82.
[18] TPO, pág. 89.

Velázquez, de la policía municipal, deciden ir a la residencia anterior, que fue la que señale en la columna anterior, de la residencia[19].

…

**Testigo**: En la mano izquierda.
**Fiscal Alvarado**: Ok.
**Testigo**: La mano izquierda y en la mano derecha tenía una lata de cerveza, que por mi conocimiento era medalla.
**Fiscal Alvarado**: OK. ¿Qué si algo hizo el acusado con esa arma de fuego durante el tiempo que usted acaba de describir?
**Testigo:** Durante todo el momento de los comandos verbales siempre estuvo moviendo la arma de fuego apuntándonos a varios de los compañeros que estábamos ahí presentes[20].

**Contrainterrogatorio**

**Lcdo. Sánchez**: Y esa persona no respondía a sus comandos, ¿correcto?
**Testigo**: Desistió de los comandos verbales.
**Lcdo. Sánchez**: Desistió, o sea, no le hizo caso.
**Testigo**: No.
**Lcdo. Sánchez**: Y esa persona estaba alterada, ¿verdad que sí?
**Testigo**: Por lo que logre apreciar sí.
**Lcdo. Sánchez**: Estaba perturbada, ¿verdad que sí[21]?
…

**Lcdo. Sánchez**: No. Y usted lo que observa es a un caballero, pantalones cortos, sin camisa, con alegadamente una pistola en la mano izquierda, y una lata de cerveza medalla, dijo usted, en la mano derecha, ¿correcto?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Que decía, mátenme. ¿Verdad que sí[22]?
…

**Lcdo. Sánchez:** Oiga, y le pregunto, si se veía cuando decía mátenme, se veía desquiciado.
**Fiscal Marcano**: Vamos a tener reparo, juez.
**Juez:** Ya yo resolví esa controversia, licenciado.
**Lcdo. Sánchez**: Retomando, dijo que alterado.
**Juez:** Eso fue lo que dijo anteriormente.
**Fiscal Marcano**: Reparo repetitivo.
**Juez**: Ha lugar[23].
**Lcdo. Sánchez**: ¿Dónde está la lata de cerveza que él tenía alegadamente en la mano derecha?
**Testigo**: No la veo.
**Lcdo. Sánchez**: No sale, ¿verdad que no?
**Testigo**: No, no la veo.
**Lcdo. Sánchez**: Mostrándole el "Exhibit" 7N, nuevamente, ahí se ve toda la entrada. ¿Dónde está la lata de cerveza Medalla? ¿Verdad que no se ve?
**Testigo**: En la posición de la foto no se ve.
**Lcdo. Sánchez**: No se ve. Mostrándole nuevamente, el "Exhibit" 7HH y 7II, se ve la entrada de unas escalera, ¿correcto?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Y se ve en el fondo unos vehículo, ¿correcto?
**Testigo**: Si.

---

[19] TPO, pág. 90.
[20] TPO, pág. 92.
[21] TPO, pág. 111.
[22] TPO, pág. 113.
[23] TPO, pág. 114.

**Lcdo. Sánchez**: Y ahí no se ve ninguna lata de cerveza, donde se ocupó esa evidencia, ¿verdad que no?
**Testigo**: No[24].

**Agente Dimaris Álvarez Burgos**

**Contrainterrogatorio**

**Lcdo. Sánchez**: Cuando usted entrevista al agente Bristol, él le indica a usted que él le daba comandos verbales al señor Rivera Matos, ¿correcto?
**Testigo**: Correcto.
**Lcdo. Sánchez:** Y él no hacía caso, ¿correcto?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Y le dijo también que él estaba alterado, ¿correcto?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Que estaba fuera de sí, ¿correcto? el señor Rivera Matos[25]
**Testigo**: Estaba descontrolado y apuntándole, diciéndole mátenme porque la mate por puta.
**Lcdo. Sánchez**: ¿Estaba descontrolado? Eso acaba de decir.
**Fiscal Marcano**: Repetitivo, Juez.
**Lcdo. Sánchez**: No, no.
**Juez**: No ha contestado la pregunta.
**Lcdo. Sánchez**: Usted acaba de decir que estaba descontrolado.
**Juez**: La pregunta es si estaba descontrolado si o no.
**Testigo**: Si.
**Lcdo. Sánchez**: ¿Sí?
**Testigo**: Si.
**Lcdo. Sánchez**: Y hizo un gesto con la mano derecha apuntando alegadamente, de lado a lado, ¿correcto?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Si aquí… o sea según el testimonio de Bristol es que le apuntaba de lado a lado, con la mano derecha, ¿correcto?[26]

**Eliud Delgado Ortiz**

**Directo**:

**Fiscal Marcano**: Además de usted y don Luis Rivera Matos y su mamá ¿quién más vivía en esa propiedad?
**Testigo**: Más nadie.
**Fiscal Marcano**: ¿Y usted entonces llega en compañía de quién?
**Testigo**: Un amigo.
**Fiscal Marcano**: ¿Cómo se llama ese amigo?
**Testigo**: Luis.
**Fiscal Marcano**: ¿Y llega a su casa y no había nadie refiérase que no estaban quienes?
**Testigo**: Ni mi mamá, ni Luis.
**Fiscal Marcano**: ¿Ni quién?
**Testigo**: Ni el acusado.
**Fiscal Marcano**: ¿Y entonces llega usted a su casa ese 31 de agosto del 2021 con su amigo Luis y qué ocurre?
**Testigo**: Nada, le había escrito a mi mamá cuando salí del trabajo ella me había dicho que iba a cocinar, entonces en ese momento pues yo decidí invitar a mi amigo, cuando yo llego a mi casa mi mamá me escribió que estaba haciéndose las uñas o sea que no estaba en la casa 15 minutos luego de

---

[24] TPO, pág. 120.
[25] TPO, pág. 153.
[26] TPO, pág. 153.

que yo esté en la casa llega Luis Rivera <u>borracho</u> y me pregunta por una W2.

**Fiscal Marcano**: ¿En dónde estaba Luis cuando eso está pasando?

**Testigo**: En la cocina.

**Fiscal Marcano**: ¿Y dónde estaba Luis Rivera cuando le pregunta de eso?

**Testigo**: En la cocina.

**Fiscal Marcano**: Y llega de ese modo, le pide la W2, don Luis a usted ¿y qué usted hace?

**Testigo**: Le digo que no sabía dónde estaba y pues nada me quedé hablando con mi amigo esperando a mi mamá.

**Fiscal Marcano**: ¿Cuánto tiempo?

**Testigo**: Aproximadamente unos 20 minutos llegó mi mamá 15 a 20 minutos.

**Fiscal Marcano**: ¿Y cuando llegó su mamá qué ocurre[27]?

**Fiscal Marcano**: Entonces le estaba diciendo usted a las damas y caballeros del jurado que esa noche usted esa noche se quedó hablando con su mamá y después que se fue su amigo Luis ¿por cuánto tiempo permanecieron hablando? 30

**Testigo**: Unos 5 o 10 minutos[28].

**Fiscal Marcano**: ¿Qué pasa transcurrido esos 5 o 10 minutos?

**Testigo**: Hablábamos, ella me había dicho que iba a hablar con Luis que quería que se fuera de la casa, que iba a hablar para que recogiera las cosas y e fuera.

**Fiscal Marcano**: ¿Eso se lo dijo usted dónde?

**Testigo**: En el comedor.

**Fiscal Marcano**: ¿Y qué pasó luego que le dice eso a su señora madre?

**Testigo**: Yo me fui a mi cuarto ya era como algo que ya se había hablado anteriormente con mi mamá[29].

**Contrainterrogatorio:**

**Lcdo. Sánchez**: Mira tú dices que fuiste la primera persona que llega a la residencia esa tarde.

**Testigo**: Si[30].

**Lcdo. Sánchez**: Y llegaste acompañado de Luis ¿correcto?

**Testigo**: Si.

**Lcdo. Sánchez**: Tu señora madre, había dicho que iba a cocinar para que fueras a comer a la casa ¿correcto?

**Testigo**: Si.

**Lcdo. Sánchez**: Pero cuando usted llega, ella todavía no estaba en la casa ¿correcto?

**Testigo**: Si.

**Lcdo. Sánchez**: Ella se estaba haciendo unas uñas, ¿correcto?

**Testigo**: Si.

**Lcdo. Sánchez**: Entonces el señor Luis Rivera no se encontraba en la casa ¿correcto?

**Testigo**: No.

**Lcdo. Sánchez**: Usted dice que él llega alegadamente borracho.

**Testigo**: Sí.

**Lcdo. Sánchez**: Pero no tuvo problemas con él cuando él llegó ¿verdad que no?

**Testigo**: No.

**Lcdo. Sánchez**: Él se fue para su cuarto ¿correcto?

**Testigo**: Si.

**Lcdo. Sánchez**: Un cuarto que él estaba habitando desde el año 2016 ¿correcto?

---

[27] TPO, pág. 249.
[28] TPO, pág. 251.
[29] TPO, pág. 252.
[30] TPO, pág. 265.

**Testigo**: No.
**Lcdo. Sánchez**: ¿No? ¿desde cuándo?
**Testigo**: 2019.
**Lcdo. Sánchez**: Usted prestó una declaración jurada el 1 de septiembre del 2021, ¿correcto?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Eso fue al otro día de los hechos ¿correcto?
**Testigo:** Si.
**Lcdo. Sánchez**: Mire si usted señala en su declaración jurada que don Luis regresó a la casa en el año 2016.
**Testigo**: Correcto[31].

...

**Lcdo. Sánchez**: Y tenían muchas discusiones ¿verdad que sí?
**Testigo**: Si.
**Lcdo. Sánchez**: Cuando su señora madre llega a la residencia, Luis permanecía en su cuarto ¿correcto?
**Testigo**: Sí.
**Lcdo. Sánchez**: Ustedes tres comieron cenaron ¿correcto?
**Testigo**: Si.
**Lcdo. Sánchez**: Luis, su señora madre y usted.
**Testigo**: Mi amigo Luis[32].

...

**Lcdo. Sánchez**: Y es su señora madre quien va al cuarto de Luis ¿correcto?
**Testigo**: Sí.
**Lcdo. Sánchez**: Usted ya está en el cuarto suyo encerrado.
**Testigo**: Sí.
**Lcdo. Sánchez**: Y usted comienza a escuchar una discusión entre ellos dos ¿correcto?
**Testigo**: Sí.
**Lcdo. Sánchez**: A su señora madre botándolo de la casa ¿correcto?
**Testigo**: Sí.
**Lcdo. Sánchez**: ¿Recuerda cuando le dijo borracho apestoso?
**Testigo**: Nunca dijo eso.
**Lcdo. Sánchez**: No.
**Lcdo. Sánchez**: Mire lo cierto es que como usted bien indicó los ánimos se fueron caldeando ¿verdad que sí?
**Testigo**: Si.
**Lcdo. Sánchez**: De parte y parte.
**Testigo**: Sí.
**Lcdo. Sánchez**: Ambas personas subieron el tono de voz ¿correcto?
**Testigo**: Correcto.
**Lcdo. Sánchez**: Y Luis le reclamaba que él no molestaba en la casa ¿correcto?
**Testigo**: Correcto.
Lcdo. Sánchez: Y le señaló a su señora madre que la que llegaba tarde la que llegaba tarde a la residencia era ella.
**Testigo**: Si[33].

...

**Lcdo. Sánchez**: Y ahí es que usted escucha la discusión haciendo referencia a otro macho ¿correcto?
**Testigo**: Sí.
**Lcdo. Sánchez**: Y según su declaración jurada su señora madre le dijo que no tenía que darle explicaciones a Luis ¿correcto?

---

[31] TPO, pág. 266.
[32] TPO, pág. 268.
[33] TPO, pág. 269.

**Testigo**: Si.

**Lcdo. Sánchez**: Y le seguía reclamando que ella lo que quería era que él se fuera para ella traer a otro macho a la casa ¿correcto?

**Testigo**: No.

**Lcdo. Sánchez**: Mire a ver si usted menciona en su declaración jurada que ella tenía un macho que lo que quería era meterlo a la casa

**Testigo**: Esas son las alegaciones de Luis, no fue que mi mamá dijo eso.

**Lcdo. Sánchez**: No, no, no, pero si usted señaló eso en su declaración jurada.

**Testigo**: Si, pues sí.

**Lcdo. Sánchez**: Si.

**Testigo**: Pero no fue mi mamá quien lo dijo.

**Lcdo. Sánchez**: No, pero usted señala establece en su declaración jurada.

**Testigo**: Que Luis dijo eso.

**Lcdo. Sánchez**: Exacto. Y también señala en su declaración jurada que siempre que discutían salía a reducir ese tipo de conversación, lo de traer a otro macho ¿correcto?

**Testigo**: Si.

**Lcdo. Sánchez**: Mire usted dice que luego que escucha los disparos observa a Luis que tenía un celular en una mano y el arma en otra mano ¿correcto?

**Testigo**: Sí.

**Lcdo. Sánchez**: ¿En qué mano tenía el arma?

**Testigo**: En la izquierda.

**Lcdo. Sánchez**: ¿Y el celular en la derecha?

**Testigo**: Sí.

**Lcdo. Sánchez**: ¿Y qué lata de cerveza usted lo vio él tener en la mano[34]?

...

### Vista 29 de abril de 2024

Juez: Muy bien. Entonces, en estricto orden de los procesos, corresponde a que discutamos las instrucciones al jurado que el tribunal va a estar ofreciendo como instrucciones finales. Obviamente, como el caso no se había sometido todavía, el tribunal no les había solicitado a las partes que sometieran por escrito las instrucciones que entendía deberían dar, pero estamos aquí para poder discutir dichos pormenores[35].

...

Juez: Señora secretaria para que se notifique la resolución en el día de hoy en la cual debe tomar nota el tribunal se ha negado a incluir como parte o ha declarado no ha lugar a incluir como parte de las instrucciones al jurado solicitado por la defensa la instrucción referente a el asesinato atenuado y el asesinato en segundo grado la justificación que ha dado el tribunal para ello es que el tribunal entiende a base de la prueba desfilada que no se ha presentado como parte de la prueba desfilada por parte del ministerio público alguna justificación que exige dicha instrucción para que se dé la instrucción del asesinato atenuado así también a base de la prueba el tribunal entiende que no hay elementos de segundo grado o de atenuado sino de asesinato en primer grado.

---

[34] TPO, pág. 270.
[35] TPO, págs. 275-276.

Culminado el desfile de prueba el 2 de mayo de 2024 a las 6:34 pm, el jurado notificó que llegaron a un veredicto unánime, en **el caso NSCR202300086 por el Artículo 93 del Código Penal, Culpable; en el caso NSCR202300087 por el Artículo 6.14 Ley 168, Culpable;** y en los **casos NSCR202300088, NSCR202300089, NSCR202300090 y NSCR202300091 por el Artículo 6.14 Ley 168, No Culpable**[36].

El 6 de agosto de 2024 se dictó la *Sentencia* apelada y se impuso una pena de noventa y nueve (99) años de cárcel en el caso **NSCR202300086 por el Artículo 93.E del Código Penal** en su modalidad de feminicidio y en el caso **NSCR202300087 por el Artículo 6.14B Ley 168**, se impuso una pena de cárcel de cinco (5) años y, en virtud de los hechos que fueron probados en el caso, se duplicó la pena para un total de diez (10) años.

Inconforme, el 30 de agosto de 2024, el apelante acudió ante nos mediante *Apelación Criminal* e imputó al TPI los siguientes señalamientos de error:

**A.** Erró el Honorable Tribunal de Primera Instancia al declarar No ha Lugar la Solicitud de absolución perentoria.

**B.** Erró el Tribunal de Primera Instancia al denegar a la defensa la solicitud de instrucción al jurado sobre homicidio atenuado, a pesar de que la prueba testifical desfilada, con testigos del Ministerio Público, surge que hubo perturbación mental, emocional o súbita pendencia.

**C.** No renuncio al derecho de poder presentar errores adicionales de derecho ante este Honrable Tribunal de Apelaciones, tras la debida evaluación del expediente de instancia y la totalidad de la prueba oral desfilada durante el juicio en su fondo, por el abogado apelativo a quien se le asigne el presente caso (Henderson v US, 133 CT 1121; 2013 y Pueblo v Soto Ríos 95 DPR 483 (1967).

Posteriormente, el 25 de septiembre de 2025, al presentar el *Alegato del Apelante*, el señor Rivera Matos solamente esbozó los siguientes dos errores:

---

[36] Expediente Original.

> Erró el Honorable Tribunal de Instancia al denegar a la defensa la solicitud de instrucción al jurado sobre homicidio atenuado, a pesar de que la prueba testifical desfilada, con testigos del Ministerio Público, surge que hubo perturbación mental, emocional o una súbita pendencia.
>
> No renuncio al derecho de poder presentar errores adicionales de derecho ante este Honrable Tribunal de Apelaciones, tras la debida evaluación del expediente de instancia y la totalidad de la prueba oral desfilada durante el juicio en su fondo, por el abogado apelativo a quien se le asigne el presente caso (Henderson v US, 133 CT 1121; 2013 y Pueblo v Soto Ríos 95 DPR 483 (1967).

De igual manera, el 17 de noviembre de 2025, se presentó el *Alegato de el Pueblo de Puerto Rico.* Así pues, con el beneficio de la comparecencia de las partes, procedemos a exponer la normativa jurídica aplicable al caso de autos.

**II.**

**-A-**

Toda persona acusada de delito grave o de un delito que apareje una pena de tal clasificación, le asiste la máxima constitucional que provee para que sea procesada en un juicio por un jurado imparcial[37]. El juicio por jurado implica que la culpabilidad, o no culpabilidad de la persona imputada, será determinada por un grupo representativo de la comunidad, luego de que, quien presida el proceso, le instruya sobre la norma jurídica aplicable a los hechos que considera[38]. La función del jurado estriba en alcanzar un veredicto libre de coerción, consistente, a su vez, con la ley y las particularidades del caso[39].

Para que los miembros del jurado ejerzan con corrección y propiedad la responsabilidad que les es encomendada, resulta imperativo que se le transmitan todos los elementos de juicio que deben considerar previo a disponer sobre la relación de la persona

---

[37] Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1; *Pueblo v. Agudo Olmeda,* 168 DPR 554 (2006).

[38] *Pueblo v. Negrón Ayala,* 171 DPR 406 (2007); *Pueblo v. Echevarría Rodríguez I,* 128 DPR 299 (1991); *Pueblo v. Laboy,* 110 DPR 164 (1980).

[39] *Pueblo v. Negrón Ayala, supra*; *Pueblo v. González Colón,* 110 DPR 812 (1981); *Pueblo v. Rosario Centeno,* 90 DPR 874 (1964); Véase, además, J. M. Farinacci Fernós, *La Carta de Derechos,* San Juan, Editorial de la Universidad Interamericana de Puerto Rico, 2021, pág. 211; E. Batista Ortiz, *El Jurado: su función, características y propósitos,* 3ra ed., San Juan, Ed. SITUM, 2007, pág. 1.

acusada en el asunto. En ese sentido, las instrucciones al jurado se perfilan como mecanismo mediante el cual estos advienen al conocimiento efectivo del derecho aplicable al caso[40]. Su propósito es ilustrar y familiarizar a los miembros de este cuerpo con las normas básicas de ley en las cuales deben fundamentar su veredicto. El estado de derecho exige que las instrucciones que el juez o la jueza imparta al jurado sean correctas, claras, precisas y lógicas[41]. En consecución de este principio, la Regla 137 de Procedimiento Criminal[42], dispone que:

> Terminados los informes, el tribunal deberá instruir al jurado haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho necesarias para la información del jurado. Por estipulación de las partes, hecha inmediatamente antes de empezar las instrucciones y aprobada por el tribunal, se podrá omitir hacer el resumen de la evidencia. Todas las instrucciones serán verbales a menos que las partes consintieren otra cosa. Cualquiera de las partes podrá presentar al tribunal una petición escrita de que se den determinadas instrucciones, al terminar el desfile de la prueba, o anteriormente si el tribunal razonablemente así lo ordena. Deberá servirse copia de dicha petición a la parte contraria. El tribunal podrá aceptar o rechazar cualquiera o todas dichas peticiones, anotando debidamente su decisión en cada una, e informará a las partes de su decisión antes de que [e]stas informen al jurado. Ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a ellas o solicitare instrucciones adicionales antes de retirarse el jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud. Se le proveerá oportunidad para formular [e]stas fuera de la presencia del jurado. El tribunal procederá entonces a resolver la cuestión, haciendo constar su resolución en el expediente o trasmitiendo cualquier instrucción adicional que estimare pertinente. Al terminar las instrucciones el tribunal nombrará al presidente del jurado y ordenará que el jurado se retire a deliberar. En sus deliberaciones y veredicto el jurado vendrá obligado a aceptar y aplicar la ley según la exponga el tribunal en sus instrucciones.

A la luz del transcrito precepto, el juzgador de instancia está llamado a instruir apropiadamente a los miembros del jurado sobre todas las cuestiones sometidas a su escrutinio. En el ánimo de traer a su atención los hechos esenciales ventilados en sala, como norma,

---

[40] *Pueblo v. Rodríguez Vicente,* 173 DPR 292 (2008).
[41] *Pueblo v. Acevedo Estrada,* 150 DPR 84 (2000); *Pueblo v. Echevarría Rodríguez I, supra*; *Pueblo v. Andrades González,* 83 DPR 849 (1961).
[42] 34 LPRA Ap. II, R. 137.

debe resumir la prueba desfilada, para evitar que cuestiones irrelevantes en el asunto se consideren al momento de su resolución final, todo sin apartarse de la prueba presentada y admitida en juicio y sin dar más énfasis a un evento que a otro[43].

Con relación al ámbito normativo, la instrucción impartida al jurado debe proveer para que se cubran todos los elementos esenciales del delito imputado, así como los de aquellos inferiores comprendidos en el mismo y todos los aspectos de derecho que, bajo cualquier teoría razonable, resulten ser pertinentes a las deliberaciones, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad[44]. Por su parte, el profesor Chiesa Aponte señala que el juez o la jueza tiene discreción para denegar la instrucción si estima que el derecho penal sustantivo no la sostiene[45]. Por tanto, si la evidencia resulta insuficiente en derecho para establecer la comisión del delito, el juez o la jueza podrá denegar la instrucción[46]. La solicitud de la instrucción será evaluada de la manera más favorable para la persona acusada[47].

En cuanto a los delitos inferiores comprendidos en el delito imputado, el Tribunal Supremo de Puerto Rico ha establecido que estas no se impartirán de forma automática, sino que es necesario que exista evidencia sobre la cual el jurado pueda inferir razonablemente que la persona acusada es culpable del delito inferior[48]. "Aun cuando esa evidencia sea escasa o débil, la misma debe apreciarse por el jurado y no por la corte"[49]. Así, pues, el fundamento para impartir la instrucción al jurado sobre un delito

---

[43] *Pueblo v. Acevedo Estrada, supra*; *Pueblo v. Echevarría Rodríguez I, supra*; *Pueblo v. Rodríguez Esmurria,* 90 DPR 532 (1964).
[44] *Pueblo v. Rosario,* 160 DPR 592 (2003); *Pueblo v. Acevedo Estrada, supra*; *Pueblo v. Miranda Santiago,* 130 DPR 507 (1992); *Pueblo v. Bonilla Ortiz,* 123 DPR 434 (1989).
[45] E. L. Chiesa Aponte, *Procedimiento Criminal y La Constitución: Etapa Adjudicativa,* San Juan, Ed. SITUM, 2018, pág. 503.
[46] *Pueblo v. Negrón Ayala, supra*, pág. 415.
[47] Chiesa Aponte, *op. cit.*, pág. 503.
[48] *Pueblo v. Negrón Ayala, supra.*
[49] *Pueblo v. Serbiá,* 75 DPR 394, 398 (1953).

menor incluido estriba en que esté apoyada en prueba que así la justifique[50]. De este modo, en los casos en que se solicite una instrucción por asesinato atenuado (antes homicidio)[51], si "claramente aparece demostrado por la prueba que no se trata de un delito de homicidio sino de un asesinato, no tiene necesidad el juez [o la jueza] de dar instrucciones referentes al delito de homicidio"[52].

La prueba que justifica la instrucción para el delito menor incluido es aquella que "de ser creída por el jurado, sería suficiente como cuestión de derecho penal sustantivo, para que [la persona] el acusad[a] prevalezca. El juez [o la jueza] no debe aquí hacer juicio de credibilidad alguno para no impartir la instrucción, pues estaría usurpando funciones del jurado, en violación al derecho constitucional [de la persona] acusad[a] a juicio por jurado"[53].

En cuanto a la instrucción sobre intoxicación voluntaria, nuestro Tribunal Supremo ha señalado que esta deberá "ser transmitida al jurado cuando ante [e]ste ha desfilado prueba tendiente a demostrar la intoxicación [de la persona] acusad[a] al tiempo de cometer el delito y antes de ello"[54]. Por tanto, la persona acusada deberá demostrar que se encontraba en estado de embriaguez al momento de cometer el delito[55].

Por igual, los miembros del jurado deben ser adecuadamente advertidos sobre la carga probatoria requerida para establecer la comisión del delito objeto del procedimiento, así como la forma de culpabilidad exigida; a saber, el aspecto de intención o de

---

[50] *Íd.*
[51] Antes de las enmiendas incorporadas mediante la Ley Núm. 246-2014, el delito de asesinato atenuado se conocía como "homicidio". Ley Núm. 146-2012.
[52] *Pueblo v. Rodríguez*, 34 DPR 464 (1925); *Pueblo v. Rosario, supra.*
[53] *Pueblo v. Negrón Ayala, supra*, págs. 415–416, citando a E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1992, Vol. II, pág. 332.
[54] *Pueblo v. Sánchez Vega*, 97 DPR 133, 143 (1969).
[55] *Pueblo v. Febres*, 78 DPR 893, 899 (1956).

negligencia, según sea el caso, puesto que deben determinar la presencia de los elementos subjetivos del actor[56].

Ahora bien, consideraciones relativas a la uniformidad en la administración de la justicia y al ideal de minimizar todo grado de error posible en las instrucciones que se transmiten a los miembros del jurado, fundamentan la doctrina que establece que, la mejor práctica de los tribunales de instancia es basar sus instrucciones en el Manual de Instrucciones al Jurado[57]. Lo anterior también fomenta el que los miembros del jurado no queden expuestos a instrucciones largas o repetitivas, y sí a aquellas que se ajusten a la ley[58].

Nuestro Tribunal Supremo ha destacado que existe una presunción de corrección cuando las instrucciones impartidas al jurado no fueron objetadas en su momento por la defensa[59]. Es decir, que la falta de objeción "resulta en una garantía adicional de que todos los señores [y las señoras] del jurado que intervinieron en el proceso de deliberación [...] emitieron sus votos con una correcta percepción y entendimiento del derecho aplicable al mismo"[60]. Además, el no objetar oportunamente constituye una renuncia a levantar dichas instrucciones como error en apelación[61]. Sobre ese particular, nuestro más Alto Foro ha resuelto que "es tardío un planteamiento en apelación impugnando las instrucciones del juez [o la jueza] al jurado cuando la defensa no objeta dichas instrucciones ni solicita instrucciones adicionales"[62]. Incluso, si no objeta de carácter general las instrucciones transmitidas, se renuncia a los errores que no lesionen derechos fundamentales[63].

---

[56] *Pueblo v. Rosario, supra; Pueblo v. Bonilla Ortiz, supra.*
[57] *Pueblo v. Mangual Hernández,* 111 DPR 136 (1981).
[58] *Pueblo v. Velázquez Caraballo,* 110 DPR 369 (1980).
[59] *Pueblo v. Jiménez Hernández,* 116 DPR 632 (1985).
[60] *Íd.,* págs. 638-639.
[61] *Pueblo v. Ortiz González,* 111 DPR 408, 410, 412 (1981).
[62] *Pueblo v. Romero Cuesta,* 101 DPR 404, 408 (1973), citando a *Pueblo v. Torres Rolón,* 99 DPR 970 (1971).
[63] *Pueblo v. Del Valle,* 91 DPR 174 (1964).

Añadimos que, se vulnera la garantía fundamental de un juicio justo cuando el tribunal no imparte una instrucción solicitada por la defensa sobre el delito de homicidio voluntario, y la misma está justificada en la evidencia[64]. Por tanto, el efecto será la revocación de la sentencia apelada y la celebración de un nuevo juicio[65].

**-B-**

De conformidad con lo expresamente estatuido en el Artículo 92 del Código Penal de 2012, el delito de asesinato se define como "dar muerte a un ser humano a propósito, con conocimiento o temerariamente"[66]. El elemento objetivo del delito de asesinato es dar muerte a un ser humano; mientras que el elemento subjetivo, es cuando la persona actúa a propósito, con conocimiento o temerariamente[67]. Asimismo, el Artículo 22 (1)(a) del Código Penal de 2012 señala que, "una persona actúa 'a propósito' cuando su objetivo consciente es la producción de dicho resultado"[68]. A su vez, una persona actúa con conocimiento "cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta". Artículo 22 (2)(a) del Código Penal de 2012, *supra*.

Según la profesora Dora Nevárez Muñiz, la Ley Núm. 246-2014 que enmendó el Código Penal de 2012, flexibilizó los requisitos para probar el asesinato en primer grado, puesto que se sustituyó el elemento de premeditación y deliberación por los elementos de "a propósito" o "con conocimiento"[69]. En ese sentido, bajo el elemento de deliberación y premeditación se requería que el acto fuera pensado de antemano; es decir, que se llegara a la intención de

---

[64] *Pueblo v. González Colón, supra.*
[65] *Íd.*
[66] 33 LPRA sec. 5142.
[67] D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado*, 4ta ed. rev., San Juan, SITUM, 2019, pág. 149-150.
[68] 33 LPRA sec. 5014.
[69] Nevares Muñiz, *op. cit.*, págs. 153-155; Véase, además, F. M. Pacheco Camacho, *Enmiendas al Código Penal 2012: Cambios al Elemento de Intención Criminal,* 55 Rev. Der P.R. 41 (2015).

matar luego de alguna consideración[70]. No obstante, no era necesario un intervalo de tiempo determinado entre la intención de matar y el acto de matar, por lo que el delito de asesinato en primer grado podía formarse sin la deliberación del acto[71]. De este modo, con los elementos de "a propósito" o "con conocimiento", ya no es necesario probar la deliberación previa a la resolución de matar[72]. Ante ello, se hace más comprensible la instrucción que se imparta al jurado sobre el elemento mental[73].

A fin de exponer los grados de asesinato reconocidos en nuestro ordenamiento penal, el Artículo 93 del Código Penal de 2012[74], reza como sigue:

> Constituye asesinato en primer grado:
> (a) Todo asesinato perpetrado por medio de veneno, acecho, tortura, o a propósito o con conocimiento.
> [...]

Cónsono con el precitado artículo, se considera que una persona actúa "a propósito" cuando "el objetivo consciente o finalidad de su conducta es llevar a cabo el resultado prohibido por ley [...] o cuando cree que la circunstancia existe"[75]. Por lo que, cuando el Estado sostiene que el acto se cometió "a propósito", deberá probar que la persona acusada conscientemente quería incurrir en la conducta, **como el acto de apuntar o disparar un arma**; o la persona acusada conscientemente quería causar el resultado, como el daño o la muerte de la víctima[76]. De otro lado, una persona actúa "con conocimiento" cuando "la existencia de la circunstancia o del resultado es una prácticamente segura [que] se refiere a una probabilidad muy alta"[77]. En ese sentido, si se imputa la comisión al amparo de esta modalidad, el Estado tiene que

---

[70] *Pueblo v. Concepción Guerra*, 194 DPR 291, 305 (2015).
[71] *Íd.*
[72] Nevares Muñiz, *op. cit.*; F. M. Pacheco Camacho, *supra.*
[73] *Íd.*
[74] 33 LPRA sec. 5142 (d).
[75] D. Nevares Muñiz, *Código Penal de Puerto Rico*, Ed. 2015, Instituto para el Desarrollo del Derecho, Inc., San Juan, pág. 46.
[76] *Íd.*
[77] *Íd.*

establecer que la persona acusada estaba consciente que el resultado o el daño se produciría[78].

Por otro lado, el Artículo 95 del Código Penal de 2012 establece que el asesinato atenuado es: "Toda muerte causada a propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia, será sancionada con pena de reclusión por un término fijo de quince (15) años"[79]. Se trata de un delito menor incluido bajo la modalidad de asesinato en primer grado[80].

Surge del citado artículo que los elementos del delito son: (1) dar muerte a un ser humano (2) a propósito, con conocimiento o temerariamente[81]. Sin embargo, dicho articulado permite atenuar la pena "por razón de que la muerte es consecuencia de una súbita pendencia o de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable"[82].

En *Pueblo v. Guadalupe Rivera*, 206 DPR 616, 633–634 (2021), el Tribunal Supremo de Puerto Rico se expresó sobre la vigencia de las interpretaciones del delito de homicidio bajo la legislación previa al Código Penal de 2012. En particular, puntualizó que:

> El Art. 95 del Código Penal de Puerto Rico de 2012 [...] tipifica el delito de asesinato atenuado. Esta disposición penal establece que el delito se comete por "[t]oda muerte causada a propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia [...]". Como consecuencia, el delito se consuma al incurrir en un acto intencional —con propósito, conocimiento o temerariamente— que causa la muerte a otra, pero, por existir circunstancias atenuantes importantes, el delito y la pena cambian en beneficio [de la persona] acusad[a]. En otros términos, se modifica el delito y la pena a favor [de la persona] acusad[a] por las circunstancias que disipan la

---

[78] *Íd.*
[79] 33 LPRA sec. 5144.
[80] E. L. Chiesa Aponte, *Derecho Procesal Penal*, 84 Rev. Jur. U.P.R. 665, 677 (2015).
[81] Nevares Muñiz, *op. cit.*, págs. 160-161.
[82] *Íd.*, pág. 161.

gravedad de la conducta, pues, sin estas, la persona incurriría en el delito de asesinato en primer grado o asesinato [en] segundo grado.

En *Pueblo v. Negrón Ayala*, [...] en el contexto de las frases "súbita pendencia" y "arrebato de cólera", señalamos que "la circunstancia atenuante consiste en que el acto [de la persona] acusad[a] *fue una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con [e]sta*". En virtud de la definición de *homicidio* que contenía el Código Penal de 1974, expresamos que "[e]l homicidio presupon[ía] que [la persona] autor[a] de la muerte actuó movid[a] por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar según sus impulsos mentales causados por la cólera, pendencia o emoción violenta". Aclaramos, además, que "la sed de venganza nunca ser[ía] suficiente para catalogar el delito como un homicidio". Dado a que el delito de asesinato atenuado requiere una "perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia" [...], **estos principios siguen vigentes**. *Pueblo v. Guadalupe Rivera*, supra. (Citas omitidas) (Énfasis original).

Nuestro más Alto Foro ha identificado factores para determinar la posible comisión de homicidio, a saber: (1) que la muerte haya ocurrido mientras la persona actora se encontraba en un arrebato de cólera o de pendencia súbita; (2) que la muerte esté precedida de una provocación adecuada, y (3) que la muerte ha ocurrido antes de que el arrebato o pendencia sufrida por la persona actora se hubiere razonablemente "enfriado"[83].

Sobre este particular, la profesora Dora Nevares Muñiz ha enfatizado que, bajo el texto vigente, los factores de provocación y enfriamiento se flexibilizaron[84]. Sin embargo, estos siguen siendo elementos para tomar en consideración a la hora de determinar si ocurrió el asesinato atenuado[85].

Ahora bien, el Tribunal Supremo de Puerto Rico ha aclarado que no es homicidio cuando la agresión se dirige contra un bebé que lloraba mientras los padres discutían[86]. En esa ocasión, el Alto Foro señaló: "El hecho de que [de la persona] acusad[a] le diera coraje y aun cuando estuviera 'rabios[a]' porque su concubina l[a] mandó a

---

[83] *Pueblo v. Negrón Ayala*, *supra*, pág. 418.
[84] Nevares Muñiz, *op. cit.*, págs. 161-162.
[85] *Íd.*
[86] *Pueblo v. López Rodríguez*, 101 DPR 897 (1974).

buscar unos baldes de agua [,] no es suficiente para que un[a] [persona] de temperamento corriente pierda el dominio de s[í] mism[a], se ensañe contra una indefensa niña, que es su propia hija y la azote violentamente contra el suelo hasta ocasionarle la muerte"[87]. De este modo, el Foro de última instancia confirmó la sentencia que declaró culpable a López Rodríguez por asesinato en primer grado[88]. No obstante, se acepta la defensa de asesinato atenuado cuando por error de hecho se dirige la agresión contra un tercero[89].

**-C-**

El Código Penal de 2012 define la tentativa en su Artículo 35, como sigue:

> Existe tentativa cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad[90].

Para que se constituya la tentativa, el Código Penal de 2012 exige que: (1) se realice una acción u omisión; (2) que esta sea a propósito o con conocimiento y de forma inequívoca, es decir, que sin lugar a duda se cometerá el delito que no llegó hasta su estado de consumación; (3) que debe constituir la fase inmediatamente anterior a la consumación del acto exigido por el tipo; y (4) un resultado que no se ha verificado o consumado por causas ajenas a la voluntad de la persona actora[91].

**-D-**

Por su parte, el Artículo 42 del Código Penal de 2012 dispone lo siguiente:

> La voluntaria intoxicación por drogas, sustancias narcóticas, estimulantes o deprimentes, o sustancias similares no es

---

[87] *Íd.*, pág. 900.

[88] *Íd.*

[89] Nevares Muñiz, *op. cit.*, pág. 162, citando *a Pueblo v. López Rivera*, 109 DPR 160 (1979).

[90] 33 LPRA sec. 5048.

[91] Nevares Muñiz, *op. cit.*, págs. 75-76; Véase, además, D. Nevares Muñiz, *La Tentativa de Delito en el Código Penal de 2004: Figura de Convergencia*, 43 Rev. Jur. U.I.P.R. 371 (2009).

admisible para establecer que la persona se encontraba en un estado de inimputabilidad o para negar que la persona intoxicada actuó temerariamente o negligentemente. No obstante, un estado de intoxicación voluntaria es admisible para negar que la persona intoxicada actuó a propósito o con conocimiento[92].

Según este artículo, se prohíbe el uso de la intoxicación voluntaria para negar "temeridad" y "negligencia"; empero, se permite para negar "a propósito" o "con conocimiento"[93]. Asimismo, la embriaguez "tiene que ser de tal grado o carácter que inhiba en [la persona] acusad[a] su facultad mental para formar la intención específica requerida por el Código para la convicción de un delito — o grado del mismo— en el cual se requiera tal intención específica, y que la determinación de ese hecho es esencialmente una para el jurado o la corte juzgadora"[94]. En ese sentido, bajo el Código Penal de 2012, la intoxicación voluntaria solo podrá alegarse para reducir el delito de asesinato en primer grado a uno de asesinato en segundo grado[95].

Nuestra Alta Curia ha señalado que la mera prueba de embriaguez no suficiente para rebajar los grados del delito[96]. Así, pues, prueba de que la persona se había dado un par de tragos o de que se había fumado un cigarrillo de marihuana no es suficiente para rebajar la clasificación del delito[97].

**-E-**

La Sexta Enmienda de la Constitución de Estados Unidos y la Sección II del Art. II de la Constitución de Puerto Rico garantizan el derecho de toda persona acusada de un delito grave a ser juzgado por un jurado imparcial[98].

---

[92] 33 LPRA sec. 5065.
[93] Nevares Muñiz, *op. cit.*, pág. 87.
[94] *Pueblo v. Robles González*, 132 DPR 554, 562 (1993); *Pueblo v. Méndez Ramos*, 108 DPR 59, 62 (1978); *Pueblo v. Rivera*, 70 DPR 570, 573-574 (1949).
[95] Nevares Muñiz, *op. cit.*, pág. 88.
[96] *Pueblo v. Méndez Ramos, supr*a, pág. 62.
[97] Nevares Muñiz, *op. cit.*, pág. 87, citando a *Pueblo v. Caballero Rodríguez, supra*; Véase, además, *Pueblo v. Delgado Lafuente*, 97 DPR 266 (1969).
[98] *Pueblo* v. *Centeno,* 208 DPR 1, 10-11 (2021).

Nuestro ordenamiento jurídico presume que los deberes de un jurado se han cumplido con regularidad. No obstante, esa presunción puede rebatirse con prueba que demuestre la irregularidad del procedimiento[99]. El veredicto no puede alterarse por indebida presión o influencia al jurado en ausencia de evidencia prima facie de que un elemento extraño permitió la decisión de mayoría. La confidencialidad del proceso deliberativo cede ante la existencia de evidencia prima facie de una anormalidad que afectó seriamente la realización de la justicia y el esclarecimiento de la verdad. Al acusado le compete rebatir la presunción de que el jurado basó su veredicto en la prueba y no en hechos extraños o bajo indebida influencia o presión. El veredicto del jurado no puede atacarse bajo la premisa de prejuicio implícito, ya que debe demostrase un perjuicio real. El acusado que alegue error perjudicial tiene que demostrar que la decisión o actuación objetada tuvo impacto y relieve perceptible en la objetividad del juicio[100].

La Regla 145 de Procedimiento Criminal[101], impone al tribunal la obligación de preguntarle al presidente del Jurado si el veredicto que se entregó por escrito es el del jurado y cuántos de sus miembros votaron en favor del mismo. El veredicto será aceptado por el tribunal y leído por el secretario, si el presidente responde en la afirmativa y es conforme a la ley.

**III.**

Tras revisar minuciosamente el expediente, discutiremos el único error contendido por el apelante en su recurso, a saber:

> Erró el Honorable Tribunal de Instancia al denegar a la defensa la solicitud de instrucción al jurado sobre homicidio atenuado, a pesar de que la prueba testifical desfilada, con testigos del Ministerio Público, surge que hubo perturbación mental, emocional o una súbita pendencia.

---

[99] *Pueblo* v. *Santiago Acosta,* 121 DPR 727, 738-739 (1988).
[100] *Pueblo* v. *Figueroa Rosa,* 112 DPR 154, 158-161 esc. 3 (1982).
[101] 34 LPRA sec. 145.

Alega el apelante que el TPI impartió instrucciones únicamente en torno al delito de asesinato en primer grado, a pesar de haber solicitado instrucciones sobre el delito de asesinato atenuado y posesión incidental de arma de fuego. Arguye que el veredicto pudo ser distinto, si el tribunal no se hubiese equivocado en las instrucciones que le dio al jurado.

Por su parte, el Procurador General esboza[102] que la representación legal del apelante sostiene que el foro apelado erró al denegar impartir unas instrucciones al jurado relacionadas a los delitos de asesinato en segundo grado o asesinato atenuado, al entender que la prueba que se desfiló en el juicio, presuntamente demuestra que: *(1) al momento de asesinar a su expareja se encontraba en un estado de intoxicación voluntaria que le imposibilitaba haber actuado a propósito o con conocimiento, y (2) que el asesinato fue cometido como consecuencia de una perturbación mental o emocional para la cual existía una explicación razonable (una supuesta discusión entre el acusado y la víctima)*[103]. No obstante, argumenta el Procurador General que, contrario a lo sugerido por el señor Rivera Matos en su recurso, nada en la prueba lleva a concluir razonablemente que el apelante se encontraba bajo un estado de intoxicación voluntaria capaz de impedir que actuara a propósito o con conocimiento al asesinar a la señora Ortiz Rosario. Destaca que el apelante resalta algunas escuetas expresiones de los agentes respecto a que, al momento del arresto, este tenía una lata de cerveza en su mano, que el testigo Eliud Delgado Ortiz testificó que el apelante estaba borracho cuando llegó a la casa el día de los hechos. Sin embargo, afirma que esta única expresión no resulta suficiente para establecer que, al momento del asesinato, el apelante haya estado en un estado de intoxicación tan contundente que le

---

[102] Alegato del Pueblo de Puerto Rico.
[103] *Íd.*

haya impedido actuar a propósito o con conocimiento. Además, indica que la defensa no trajo prueba alguna para sustentar esta aseveración y tampoco surge del expediente que haya solicitado la instrucción específica sobre la defensa de intoxicación voluntaria[104].

Evaluada la transcripción y los autos del caso, concluimos que la defensa no nos colocó en posición de pasar juicio sobre las discusiones y objeciones en el estrado sobre las instrucciones al jurado. Ante ello, incumplió con lo establecido en *Pueblo v. Ortiz Colón,* 207 DPR 100, 105 (2021)[105]. La representación legal del apelante no expuso en corte abierta para que constara en la grabación del tribunal su solicitud de instrucciones al jurado y los fundamentos de sus objeciones que alegó expuso en el estrado. Su representación legal pasó por alto que las conversaciones en el estrado no son parte de la transcripción y falló al no plantear en corte abierta su interés de preservarlas en el récord. Es por ello que, no hay constancia en la transcripción de expresiones relacionadas a que los abogados de defensa hayan cuestionado las instrucciones que recibió el jurado y que ahora cuestiona en apelación. Por el contrario, surge de la transcripción que los representantes legales del apelante solicitaron la instrucción referente al asesinato atenuado y al asesinato en segundo grado. No obstante, no obra en autos la discusión de la defensa sobre una explicación o excusa razonable que justifique el estado mental del actor a la luz de la totalidad de las circunstancias del caso. Además, la prueba desfilada demostró que el tribunal no tenía que instruir al jurado sobre el delito comprendido de asesinato atenuado, porque el

---

[104] *Íd.*

[105] Nuestro más Alto Foro judicial estatal denegó la solicitud de nuevo juicio porque: (1) las conversaciones en el estrado no tienen que estar incluidas en la transcripción, (2) el apelante no planteó en corte abierta su interés de preservar las discusiones en el estrado, (3) el apelante no pidió que se grabaran en el récord los fundamentos de las objeciones discutidas en el estrado.

Ministerio Público demostró que el apelante cometió el delito de asesinato en primer grado.

Ante ese escenario, procede confirmar el veredicto del jurado y la sentencia apelada. En consecuencia, no prospera el argumento argüido de que debió imponerse asesinato atenuado o de segundo grado.

**IV.**

Por los fundamentos que anteceden, los que hacemos formar parte de este dictamen, ***confirmamos*** la sentencia apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones